No. 72          December 18, 2014          543

IN THE SUPREME COURT OF THE
STATE OF OREGON

Myles A. BAGLEY,
individually,
*Petitioner on Review,*
*and*

Al BAGLEY,
individually;
and Lauren Bagley,
individually,
*Plaintiffs,*

*v.*

MT. BACHELOR, INC.,
dba Mt. Bachelor Ski and Summer Resort,
*Respondent on Review,*

*and*

John DOES 1-10,
*Defendants.*

(CC 08CV0118SF; CA A148231; SC S061821)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 7, 2014.

Kathryn H. Clarke, Portland, argued the cause and filed the briefs for petitioner on review. With her on the briefs was Arthur C. Johnson.

Andrew C. Balyeat, Balyeat & Eager, LLP, Bend, argued the cause and filed the brief for respondent on review.

Michael J. Estok, Lindsay Hart, LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

_____

* Appeal from Deschutes County Circuit Court, Stephen P. Forte, Judge. 258 Or App 390, 310 P3d 692 (2013).

Kristian Roggendorf, Roggendorf Law LLC, Lake Oswego, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

BREWER, J.

The decision of the Court of Appeals is reversed. The judgment of the trial court is reversed, and the case is remanded to that court for further proceedings.

**BREWER, J.**

The issue on review in this case is whether an anticipatory release[1] of a ski area operator's liability for its own negligence in a ski pass agreement is enforceable in the face of an assertion that the release violates public policy and is unconscionable. Plaintiff suffered serious injuries while snowboarding over a jump in defendant ski area operator's "terrain park," and brought this action alleging that defendant was negligent in the design, construction, maintenance, and inspection of the jump. Defendant moved for summary judgment based on an affirmative defense of release; plaintiff filed a cross-motion for partial summary judgment on the ground that the release was unenforceable as a matter of law. The trial court granted defendant's summary judgment motion and denied plaintiff's cross-motion. Plaintiff appealed, asserting, among other arguments, that the trial court erred in concluding that the release did not violate public policy and that it was neither substantively nor procedurally unconscionable. The Court of Appeals affirmed. *Bagley v. Mt. Bachelor, Inc.*, 258 Or App 390, 310 P3d 692 (2013). Because we conclude that enforcement of the release would be unconscionable, we reverse and remand.

## FACTS AND PROCEDURAL BACKGROUND

We review the trial court's rulings on summary judgment to determine whether "there is no genuine issue as to any material fact" and whether "the moving party is entitled to prevail as a matter of law." ORCP 47 C. We view the historical facts set out in the summary judgment record, along with all reasonable inferences that may be drawn from them, in the light most favorable to the nonmoving party— plaintiff on defendant's motion for summary judgment, and defendant on plaintiff's cross-motion. *Id.*; *Vaughn v. First Transit, Inc.*, 346 Or 128, 132, 206 P3d 181 (2009). The historical facts in the record largely relate to the enforceability of the release at issue. Defendant's summary judgment motion did not address the issues of negligence, causation, or damages. Therefore, insofar as those issues are relevant to

---

[1] By "anticipatory release," we refer to an exculpatory agreement that purports to immunize—before an injury occurs—the released party from liability for its own tortious conduct.

the enforceability of the release, we accept as true the allegations in plaintiff's complaint. ORCP 47 C (adverse party on summary judgment has burden of producing evidence only "on any issue raised in the motion as to which adverse party would have burden of persuasion at trial").

On September 29, 2005, plaintiff purchased a season pass from defendant for use at defendant's ski area. Plaintiff was a skilled and experienced snowboarder, having purchased season passes from defendant for each of the preceding three years and having classified his skill level as of early 2006, before being injured, as an "advanced expert." Upon purchasing the season pass, plaintiff executed a written "release and indemnity agreement" that defendant required of all its patrons. That document provided, in pertinent part:

> "In consideration of the use of a Mt. Bachelor pass and/or Mt. Bachelor's premises, I/we agree to release and indemnify Mt. Bachelor, Inc., its officers and directors, owners, agents, landowners, affiliated companies, and employees (hereinafter 'Mt. Bachelor, Inc.') from any and all claims for property damage, injury, or death which I/we may suffer or for which I/we may be liable to others, in any way connected with skiing, snowboarding, or snowriding. This release and indemnity agreement shall apply to any claim even if caused by negligence. The only claims not released are those based upon intentional misconduct.

> "* * * * *

> "The undersigned(s) have carefully read and understand this agreement and all of its terms on both sides of this document. This includes, but is not limited to, the duties of skiers, snowboarders, or snowriders. The undersigned(s) understand that this document is an agreement of release and indemnity which will prevent the undersigned(s) or the undersigneds' estate from recovering damages from Mt. Bachelor, Inc. in the event of death or injury to person or property. The undersigned(s), nevertheless, enter into this agreement freely and voluntarily and agree it is binding on the undersigned(s) and the undersigneds' heirs and legal representatives.

> "By my/our signature(s) below, I/we agree that this release and indemnity agreement will remain in full force

and effect and I will be bound by its terms throughout this season and all subsequent seasons for which I/we renew this season pass.

"See reverse side of this sheet * * * for duties of skiers, snowboarders, or snow riders which you must observe."

(Capitalization omitted.)[2] The reverse side of the document detailed the "Duties of Skiers" under ORS 30.985 and ORS 30.990 and also included a printed notification that "Skiers/ Snowboarders/Snowriders Assume Certain Risks" under ORS 30.975—the "inherent risks of skiing."[3]

On November 18, 2005, plaintiff began using the pass, which stated, in part:

"Read this release agreement

"In consideration for each lift ride, the ticket user releases and agrees to hold harmless and indemnify Mt. Bachelor, Inc., and its employees and agents from all claims for property damage, injury or death even if caused by negligence. The only claims not released are those based upon intentional misconduct."

(Capitalization omitted.) Further, the following sign was posted at each of defendant's ski lift terminals:

"YOUR TICKET IS A RELEASE

"The back of your ticket contains a release of all claims against Mt. Bachelor, Inc. and its employees or agents.

---

[2] Although defendant relies on several documents that, it asserts, separately and collectively released it from liability for plaintiff's injuries, for convenience we refer to those documents in the singular throughout this opinion as "the release." In addition to the releases discussed in the text, plaintiff's father also executed a "minor release and indemnity agreement" on plaintiff's behalf, containing essentially the same terms as the other releases, because plaintiff was not yet eighteen years old when he bought the season pass. Plaintiff asserted before the trial court and the Court of Appeals that he was entitled to—and effectively did—disavow the release after he reached majority. For reasons explained in its opinion, the Court of Appeals affirmed the trial court's rejection of that argument. Plaintiff did not seek review of that holding in this court and we do not address it here.

[3] As elaborated below, Oregon has enacted statutes specifically pertaining to skiing and ski areas. *See* ORS 30.970 - 30.990. Those statutes, among other provisions, set out the "duties" of skiers, require that ski area operators inform skiers of those duties, establish notice requirements and a statute of limitations pertaining specifically to injury or death while skiing, and provide that those who engage in the sport of skiing accept and assume the risks inherent in that activity.

Read the back of your ticket before you ride any lifts or use any of the facilities of Mt. Bachelor, Inc. If you purchase a ticket from someone else, you must provide this ticket release information to that person or persons.

"Skiers and lift passengers who use tickets at this resort release and agree to hold harmless and indemnify Mt. Bachelor, Inc., its employees and agents from all claims for property damage, injury or death which he/she may suffer or for which he/she may be liable to others, arising out of the use of Mt. Bachelor's premises, whether such claims are for negligence or any other theory of recovery, except for intentional misconduct.

"If you do not agree to be bound by the terms and conditions of the sale of your ticket, please do not purchase the ticket or use the facilities at Mt. Bachelor.

"Presentation of this ticket to gain access to the premises and facilities of this area is an acknowledgment of your agreement to the terms and conditions outlined above."

(Capitalization in original.)

Beginning on November 18, 2005, plaintiff used his season pass to ride defendant's lifts at least 119 times over the course of 26 days that he spent snowboarding at the ski area. On February 16, 2006, while snowboarding over a human-made jump in defendant's "air chamber" terrain park, plaintiff sustained serious injuries resulting in his permanent paralysis. Approximately four months later, plaintiff provided defendant with notice of his injuries under ORS 30.980(1), which requires that "[a] ski area operator shall be notified of any injury to a skier *** within 180 days after the injury[.]" Within two years after he was injured, plaintiff brought this action; his complaint alleged negligence on defendant's part in designing, constructing, maintaining, and inspecting the jump on which plaintiff was injured. Defendant answered, in part, by invoking the affirmative defense of release, pointing to the above-quoted documents.

In its summary judgment motion, defendant asserted that plaintiff "admittedly understood that he [had] entered into a release agreement and was snowboarding under its terms on the date of [the] accident." Defendant

argued that the release conspicuously and unambiguously disclaimed its future liability for negligence, and that the release was neither unconscionable nor contrary to public policy under Oregon law, because "skiers and snowboarders voluntarily choose to ski and snowboard and ski resorts do not provide essential public services." Thus, defendant reasoned, there was no material issue of fact as to whether the release barred plaintiff's action, and defendant was entitled to judgment as a matter of law.

In his cross-motion for partial summary judgment, plaintiff asserted that the release was unenforceable because it was contrary to public policy and was "both substantively and procedurally unconscionable." The trial court rejected plaintiff's public policy and unconscionability arguments, reasoning that "[s]now riding is not such an essential service which requires someone such as [p]laintiff to be forced to sign a release in order to obtain the service." Accordingly, the trial court granted summary judgment in defendant's favor and denied plaintiff's cross-motion for partial summary judgment.

As noted, the Court of Appeals affirmed. The court initially observed that the line between the public policy and unconscionability doctrines on which plaintiff relied was not clearly delineated:

> "We assume without deciding that the 'void as contrary to public policy' doctrine pertaining to this type of case has not been superseded by later-evolved principles concerning substantive unconscionability. *See Restatement*[ *(Second) of Contracts*], § 208 comment a [(1981)] (unconscionability analysis generally 'overlaps' with public-policy analysis)."

*Bagley*, 258 Or App at 403 n 7. The court then proceeded separately to analyze plaintiff's arguments. It first concluded that the release did not violate public policy. In particular, the court understood plaintiff to rely on an uncodified Oregon public policy that gives primacy to the tort duties of landowners and business operators to provide safe premises for invitees. In rejecting plaintiff's argument, the Court of Appeals relied on several factors. First, the court observed that the release "clearly and unequivocally" expressed defendant's intent to disclaim liability for negligence. *Id.* at

405 ("[W]e are hard-pressed to envision a more unambiguous expression of 'the expectations under the contract'[.]"). Second, the court noted that anticipatory releases that disclaim liability only for ordinary negligence do not necessarily offend public policy where they pertain exclusively to recreational activities and, most importantly, where the party seeking to relieve itself from liability does not provide an essential public service. *Id*. The court noted that a ski resort primarily offers recreational activities that, with possible exceptions that do not apply in this case, such as training for search-and-rescue personnel, do not constitute essential public services. *Id*. at 406. Third, the court stated that plaintiff's claims were based on ordinary negligence and did not implicate a violation of any heightened duty of care. *Id*.

The court then rejected plaintiff's unconscionability argument for essentially the same reasons. First, the court concluded, the release was not procedurally unconscionable in that it did not surprise plaintiff (that is, it was conspicuous and unambiguous) and it was not impermissibly oppressive, because, even though offered on a "take it or leave it basis," plaintiff always could choose not to engage in the non-essential recreational activity that defendant offered. *Id*. at 407-08. The court also concluded that the release was not essentially unfair and, therefore, was not substantively unconscionable. *Id*. at 409. Although "favorable" to defendant, the release was not impermissibly so, the court stated, because a person does not *need* to ski or snowboard, but rather merely desires to do so. That is, the patron is free to walk away rather than accept unjust terms. *Id*. at 409-10. For those reasons, the court affirmed the trial court's summary judgment rulings and its dismissal of plaintiff's action.

## ANALYSIS

The parties' dispute in this case involves a topic—the validity of exculpatory agreements—that this court has not comprehensively addressed in decades. Although the specific issue on review—the validity of an anticipatory release of a ski area operator's liability for negligence—is finite and

particular, it has broader implications insofar as it lies at the intersection of two traditional common law domains— contract and tort—where, at least in part, the legislature has established statutory rights and duties that affect the reach of otherwise governing common law principles.

It is a truism that a contract validly made between competent parties is not to be set aside lightly. *Bliss v. Southern Pacific Co. et al*, 212 Or 634, 646, 321 P2d 324 (1958) ("When two or more persons competent for that purpose, upon a sufficient consideration, voluntarily agree to do or not to do a particular thing which may be lawfully done or omitted, they should be held to the consequences of their bargain."). The right to contract privately is part of the liberty of citizenship, and an important office of the courts is to enforce contractual rights and obligations. *W. J. Seufert Land Co. v. Greenfield*, 262 Or 83, 90-91, 496 P2d 197 (1972) (so stating). As this court has stated, however, "contract rights are [not] absolute; *** [e]qually fundamental with the private right is that of the public to regulate it in the common interest." *Christian v. La Forge*, 194 Or 450, 469, 242 P2d 797 (1952) (internal quotation marks omitted).

That "common," or public, interest is embodied, in part, in the principles of tort law. As a leading treatise explains:

> "It is sometimes said that compensation for losses is the primary function of tort law *** [but it] is perhaps more accurate to describe the primary function as one of determining when compensation is to be required.
>
> "*****
>
> "[Additionally, t]he 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer."

W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 4, 20-25 (5th ed 1984). *See also* Dan B. Dobbs, *The Law of Torts*, § 8, 12 (2000) (most commonly mentioned aims of tort law are compensation of injured persons and deterrence of undesirable behavior). A related function of the tort system

is to distribute the risk of injury to or among responsible parties. *Prosser and Keeton*, § 4, 24-25.[4]

One way in which courts have placed limits on the freedom of contract is by refusing to enforce agreements that are illegal. *Uhlmann v. Kin Daw*, 97 Or 681, 688, 193 P 435 (1920) (an illegal agreement is void and unenforceable). According to *Uhlmann*:

> "An agreement is illegal if it is contrary to law, morality or public policy. Plain examples of illegality are found in agreements made in violation of some statute; and, stating the rule broadly, an agreement is illegal if it violates a statute or cannot be performed without violating a statute."

*Id.* at 689 (internal citation omitted); *see also Eldridge et al. v. Johnston*, 195 Or 379, 405, 245 P2d 239 (1952) ("It is elementary that public policy requires that \*\*\* contracts [between competent parties], when entered into freely and voluntarily, shall be held sacred and shall be enforced by the courts of justice, and it is only when some other overpowering rule of public policy \*\*\* intervenes, rendering such agreement illegal, that it will not be enforced.").

In determining whether an agreement is illegal because it is contrary to public policy, "[t]he test is the evil tendency of the contract and not its actual injury to the public in a particular instance." *Pyle v. Kernan*, 148 Or 666, 673-74, 36 P2d 580 (1934). The fact that the effect of a contract provision may be harsh as applied to one of the contracting parties does not mean that the agreement is, for that reason alone, contrary to public policy, particularly where "the contract in question was freely entered into between parties in equal bargaining positions and did not involve a contract of adhesion, such as some retail installment contracts and insurance policies." *Seufert*, 262 Or at 92.

As we discuss in more detail below, courts determine whether a contract is illegal by determining whether it violates public policy as expressed in relevant constitutional and statutory provisions and in case law, *see, e.g.*, *Delaney v.*

---

[4] *See also Rizutto v. Davidson Ladders, Inc.*, 280 Conn 225, 235, 905 A2d 1165 (2006) (fundamental purposes of the tort system are "compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct.").

*Taco Time Int'l, Inc.*, 297 Or 10, 681 P2d 114 (1984) (looking to those sources to determine whether discharge of at-will employee violated public policy), and by considering whether it is unconscionable. With respect to the doctrine of unconscionability, one commentator has explained:

> "The concept of unconscionability was meant to counteract two generic forms of abuses: the first of which relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter the transaction; and the second of which relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having nothing to do with price or other central aspects of the transaction."

Richard A. Lord, 8 *Williston on Contracts* § 18.10, 91 (4th ed 2010). As that passage suggests, the doctrine of unconscionability reflects concerns related specifically to the parties and their formation of the contract, but it also has a broader dimension that converges with an analysis of whether a contract or contract term is illegal because it violates public policy.[5]

---

[5] This court has not distinguished between contracts that are illegal because they violate public policy and contracts that are unenforceable because they are unconscionable. However, a difference in focus between the two concepts has been described in this way:

> "[O]ur public policy analysis asks whether the contract provision at issue threatens harm to the public as a whole, including by contravening the constitution, statutes, or judicial decisions of [this state]. In contrast, an unconscionability analysis asks whether the agreement, by its formation or by its terms, is so unfair that the court cannot enforce it consistent with the interests of justice."

*Phoenix Ins. Co. v. Rosen*, 242 Ill 2d 48, 61, 949 NE2d 639 (2011). As that passage suggests, the two doctrines are aimed at similar concerns: unfairness or oppression in contract formation or terms that are sufficiently serious as to justify the conclusion that the contract contravenes the interests of justice.

Recognizing that convergence, this court often has relied on public policy considerations to determine whether a contract or contract term is sufficiently unfair or oppressive to be deemed unconscionable. *See*, *e.g.*, *William C. Cornitius, Inc. v. Wheeler*, 276 Or 747, 754-55, 556 P2d 666 (1976) (treating lessee's unconscionability defense as grounded in public policy); *Cone v. Gilmore*, 79 Or 349, 352-54, 155 P 192 (1916) (analyzing unconscionability challenge to contract enforcement based on public policy considerations); *Balfour v. Davis* 14 Or 47, 53, 12 P 89 (1886) (referring to unconscionability interchangeably with public policy considerations). Other authorities also have described the two doctrines in functionally the same terms, *see*, *e.g.*, E. Allen Farnsworth, 1 *Farnsworth on Contracts*, § 4.28, 577 (3d ed 2004) (comparing unconscionability to violation of public policy), or as involving substantially overlapping considerations, *see Restatement (Second) of Contracts* § 208 comment a (1981) (policy against unconscionable contracts or contract terms "overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy").

As discussed, the Court of Appeals concluded that the release at issue here did not violate public policy and was not unconscionable for essentially the same reasons: it was conspicuous and unambiguous, and it related to a recreational activity, not an essential public service. Likewise, neither party has suggested that different legal standards apply in determining whether the release at issue in this case violates public policy or is unconscionable. Thus, for the sake of convenience—if not doctrinal convergence—we address the parties' public policy arguments in the context of our analysis of whether, in the particular circumstances of this case, enforcement of the release would be unconscionable.[6]

Oregon courts have recognized their authority to refuse to enforce unconscionable contracts since the nineteenth century. *See Balfour*, 14 Or 47 (refusing to award

---

[6] We emphasize that it is not necessary to decide in this case whether the doctrines always are identical in practical effect or whether they may vary in their application depending on the particular circumstances of a given case. It suffices to say that we discern no difference in their practical application in this case and, therefore, for the sake of convenience, we consider plaintiff's violation of public policy theory in the context of his unconscionability arguments.

attorney fees because amount specified in contract was unconscionable); *see also Caples v. Steel*, 7 Or 491 (1879) (court may refuse specific performance if bargain is unconscionable). Unconscionability is "assessed as of the time of contract formation," and the doctrine "applies to contract terms rather than to contract performance." *Best v. U.S. National Bank*, 303 Or 557, 560, 739 P2d 554 (1987) ("Unconscionability is a legal issue that must be assessed as of the time of contract formation."); *Tolbert v. First National Bank*, 312 Or 485, 492 n 4, 823 P2d 965 (1991) (same).

Unconscionability may be procedural or substantive. Procedural unconscionability refers to the conditions of contract formation and focuses on two factors: oppression and surprise. *See*, *e.g.*, John Edward Murray, Jr., *Murray on Contracts* § 96(b), 555-56 (4th ed 2001) (describing components of procedural unconscionability). Oppression exists when there is inequality in bargaining power between the parties, resulting in no real opportunity to negotiate the terms of the contract and the absence of meaningful choice. *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 566-567, 152 P3d 940, 948 (2007); *Acorn v. Household Intern. Inc.*, 211 F Supp 2d 1160, 1168 (ND Cal. 2002). Surprise involves whether terms were hidden or obscure from the vantage of the party seeking to avoid them. *Id*. Generally speaking, factors such as ambiguous contract wording and fine print are the hallmarks of surprise. In contrast, the existence of gross inequality of bargaining power, a take-it-or-leave-it bargaining stance, and the fact that a contract involves a consumer transaction, rather than a commercial bargain, can be evidence of oppression.

Substantive unconscionability, on the other hand, generally refers to the terms of the contract, rather than the circumstances of formation, and focuses on whether the substantive terms contravene the public interest or public policy.[7] *See Restatement* § 208 comment a; *Williston*

---

[7] It sometimes can be difficult to categorize the factors on which a determination of unconscionability may be based as distinctly procedural or substantive, and even factors usually considered in assessing procedural unconscionability can help establish a violation of public policy. For example, the passage quoted above from *Williston on Contracts* § 18.10, 356 Or at ___ suggests that adhesive and fine-print terms may be substantively unconscionable. Indeed, the author

*on Contracts* § 18.10 at 91. Both procedural and substantive deficiencies—frequently in combination—can preclude enforcement of a contract or contract term on unconscionability grounds. *Restatement* § 208 comment a.[8]

Identifying whether a contract is procedurally unconscionable requires consideration of evidence related to the specific circumstances surrounding the formation of the contract at issue. By contrast, the inquiry into substantive unconscionability can be more complicated. To discern whether, in the context of a particular transaction, substantive concerns relating to unfairness or oppression are sufficiently important to warrant interference with the parties' freedom to contract as they see fit, courts frequently look to legislation for relevant indicia of public policy. When relevant public policy is expressed in a statute, the issue is one of legislative intent. *See Uhlmann*, 97 Or at 689-90 (so stating). In that situation, the court must examine the statutory text and context to determine whether the legislature intended to invalidate the contract term at issue.[9] *Id.*

---

goes on to say that "[t]he distinction between procedural and substantive abuses * * * may become quite blurred." *Williston on Contracts* § 18.10 at 108-111.

[8] In some jurisdictions, courts require both procedural and substantive unconscionability before they will invalidate a contract. *See, e.g., Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal 4th 83, 114, 99 Cal Rptr 2d 745, 6 P3d 669, 690 (2000) (procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability); *Blue Cross Blue Shield of Ala. v. Rigas*, 923 So 2d 1077, 1087 (Ala 2005) ("To avoid an arbitration provision on the ground of unconscionability, the party objecting to arbitration must show both procedural and substantive unconscionability."). This court has not addressed that issue, and because, as explained below, we conclude that both procedural and substantive considerations support the conclusion that the release here is unconscionable, we do not decide that issue in this case.

[9] Many jurisdictions that limit or prohibit the use of anticipatory releases from negligence liability on public policy grounds do so as a matter of statutory enactment, rather than common law. For example, Great Britain and the States of Louisiana and Montana have statutory provisions that forbid contracts exculpating one party from liability for negligence that results in personal injury. Unfair Contract Terms Act of 1977, ch 50, § 2(1) (Eng) ("A person cannot by reference to any contract term or to a notice given to persons generally or to particular persons exclude or restrict his liability for death or personal injury resulting from negligence."); La Civ Code Ann art 2004 ("Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party."); Mont Code Ann § 28-2-702 ("All contracts that have for their object, directly or indirectly, to exempt anyone from responsibility * * * for violation of law, whether willful or negligent, are against the policy of the law."); *see also Miller v. Fallon County*, 222 Mont 214, 221, 721 P2d 342 (1986) (under statute,

Frequently, however, the argument that a contract term is sufficiently unfair or oppressive as to be unenforceable is grounded in one or more factors that are not expressly codified; in such circumstances, the common law has a significant role to play. As the commentary to the *Restatement (Second) of Contracts* explains:

"Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court

prospective release from liability for negligence is against the policy of the law and illegal, despite being a private contract between two persons without significant public implications).

Some states use statutes to make anticipatory releases from liability for negligence void as against public policy as to businesses providing recreational activities to the public. NY Gen Oblig Law § 5-326 (every contract between recreational business owner and user of facility, pursuant to which owner receives payment for use of facilities, that exempts owner from liability for damages resulting from owner's negligence "shall be deemed void as against public policy and wholly unenforceable"); Haw Rev Stat § 663-1.54(a) ("Any person who owns or operates a business providing recreational activities to the public *** shall be liable for damages resulting from negligent acts or omissions of the person which cause injury.").

Other states have enacted more narrowly crafted statutes that deal with specific recreational activities, including skiing. For example, an Alaska statute specifically prohibits ski area operators from requiring skiers to enter into agreements releasing them from liability in exchange for the use of the facilities. Alaska Stat Ann § 05.45.120. In North Carolina, a statute imposes a duty on ski area operators "[n]ot to engage willfully or negligently in any type of conduct that contributes to or causes injury to another person or his properties." NC Gen Stat § 99C-2(c)(7); NC Gen Statute § 9C-3 (violation of duties of ski area operator that causes injury or damage shall constitute negligence); *see also Strawbridge v. Sugar Mountain Resort, Inc.*, 320 F Supp 2d 425, 433 (WD NC 2004) (in light of statutory duty imposed on ski area operators not to negligently engage in conduct that causes injury, exculpatory clause on back of lift ticket was unenforceable).

Still other states have statutes that pertain specifically to skiing and, although not addressing releases, prescribe ski area operator duties and provide that operators will be liable for a violation of those duties. Colo Rev Stat § 33-44-104(1) (violation of duties of ski area operator constitutes negligence to extent such violation causes injury to any person or damage to property); *see also Anderson v. Vail Corp.*, 251 P3d 1125, 1129-30 (Colo App 2010) (if ski area operator violated statutory duties, exculpatory agreement would not release operator from liability); Idaho Code § 6-1107 ("Any ski area operator shall be liable for loss or damages caused by its failure to follow the duties set forth in [other sections of the Idaho Code pertaining to duties of ski area operators], where the violation of duty is causally related to the loss or damage suffered."); NM Stat Ann § 24-15-11 (to same effect); ND Cent Code § 53-09-07 (same); W Va Code § 20-3A-6 (same); Utah Code Ann § 78B–4–401(public policy of Utah Inherent Risks of Skiing Act is to make ski area operators better able to insure themselves against the risk of loss occasioned by their negligence); *see also Rothstein v. Snowbird Corp.*, 175 P3d 560, 564 (Utah 2007) (by extracting a pre-injury release from plaintiff for liability due to ski resort's negligent acts, resort breached public policy underlying Utah Inherent Risks of Skiing Act).

reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to the policy although it says nothing explicitly about enforceability."

*Restatement* § 178 comment b.

This court has considered whether enforcement of an anticipatory release would violate an uncodified public policy in only a few cases. Although, in those cases, this court has not expressly analyzed the issue through the lens of unconscionability, it has followed an approach that is generally consistent with the application of that doctrine. That is, the court has not declared such releases to be *per se* invalid, but neither has it concluded that they are always enforceable. Instead, the court has followed a multi-factor approach:

> "Agreements to exonerate a party from liability or to limit the extent of the party's liability for tortious conduct are not favorites of the courts but neither are they automatically voided. The treatment courts accord such agreements depends upon the subject and terms of the agreement and the relationship of the parties."

*K-Lines v. Roberts Motor Co.*, 273 Or 242, 248, 541 P2d 1378 (1975).

In *K-Lines*, this court upheld a limitation of liability contained in a commercial sales agreement. The court held that the fact

> "[t]hat one party may possess greater financial resources than the other is not proof that such a disparity of bargaining power exists that a limitation of liability provisions should be voided.

> "When the parties are business concerns dealing in a commercial setting and entering into an unambiguous agreement with terms commonly used in commercial transactions, the contract will not be deemed a contract of *adhesion* in *the* absence of evidence of unusual circumstances."

*Id.* at 252-53. The court also noted that, in an earlier decision, it had stated:

"'There is nothing inherently bad about a contract provision which exempts one of the parties from liability. The parties are free to contract as they please, unless to permit them to do so would contravene the public interest.'"

*Id*. at 248 (quoting *Irish & Swartz Stores v. First Nat'l Bk*., 220 Or 362, 375, 349 P2d 814 (1960), *overruled on other grounds by Real Good Food v First National Bank*, 276 Or 1057, 557 P2d 654 (1976)).[10]

Soon after deciding *K-Lines*, this court, in *Real Good Food*, held that a bank—serving as a bailee for depositors—could not limit its liability for the negligence of its employees. Relying on the *Restatement (Second) of Torts*, the court held:

"Where the defendant is a common carrier, an innkeeper, a public warehouseman, a public utility, or is otherwise charged with a duty of public service, and the agreement to assume the risk relates to the defendant's performance of any part of that duty, it is well settled that it will not be given effect. Having undertaken the duty to the public, which includes the obligation of reasonable care, such defendants are not free to rid themselves of their public obligation by contract, or by any other agreement."

*Id*. at 1061 (quoting *Restatement (Second) of Torts* § 496B comment g (1965)).[11] The court in *Real Good Food* concluded

---

[10] In *K-Lines*, which, as noted, involved a commercial transaction, the court distinguished between releases from liability for ordinary negligence and releases involving more serious misconduct, concluding that the latter violate public policy, but that the former are not necessarily unenforceable. *K-Lines*, 273 Or at 249.

[11] *Restatement (Second)of Torts* § 496B provides:

"A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."

According to the comments to that section, an exculpatory agreement should be upheld if it is freely and fairly made, if it is between parties who are in an equal bargaining position, and if there is no societal interest with which it interferes. *Restatement (Second) of Torts* § 496B comment b. Comments e-j set out a non-exclusive list of situations in which releases may interfere with societal interests, insofar as they are contrary to public policy. Among other things, in addition to situations like those described in the passage quoted above, the *Restatement* refuses to give effect to express liability releases where there is a substantial disparity in bargaining power. *Restatement (Second) of Torts* § 496B comment j.

that "[b]anks, like common carriers and utility companies, perform an important public service," and the release therefore violated public policy and was unenforceable. 276 Or at 1061.

Finally, this court has held that another factor for determining whether an anticipatory release may be unenforceable is the possibility of a harsh or inequitable result for the releasing party. *Commerce & Industry Ins. v. Orth*, 254 Or 226, 231-32, 458 P2d 926 (1969) (so stating); *Estey v. MacKenzie Engineering Inc.*, 324 Or 372, 376-77, 927 P2d 86 (1996) (court's inquiry into intent of parties to immunize against negligence "focuse[s] not only on the language of the contract, but also on the possibility of a harsh or inequitable result that would fall on one party by immunizing the other party from the consequences of his or her own negligence").

We glean from those decisions that relevant procedural factors in the determination of whether enforcement of an anticipatory release would violate public policy or be unconscionable include whether the release was conspicuous and unambiguous; whether there was a substantial disparity in the parties' bargaining power; whether the contract was offered on a take-it-or-leave-it basis; and whether the contract involved a consumer transaction. Relevant substantive considerations include whether enforcement of the release would cause a harsh or inequitable result to befall the releasing party; whether the releasee serves an important public interest or function; and whether the release purported to disclaim liability for more serious misconduct than ordinary negligence. Nothing in our previous decisions suggests that any single factor takes precedence over the others or that the listed factors are exclusive. Rather, they indicate that a determination whether enforcement of an anticipatory release would violate public policy or be unconscionable must be based on the totality of the circumstances of a particular transaction. The analysis in that regard is guided, but not limited, by the factors that this court previously has identified; it is also informed by any other considerations that may be relevant, including societal expectations.[12]

---

[12] Justice Peterson eloquently described the role of societal expectations in informing the development of both the common law and legislation:

With those principles in mind, we first consider the factors that usually are described as procedural, *viz*., those pertaining to the formation of the agreement. Plaintiff does not contend that the release was inconspicuous or ambiguous; that is, plaintiff does not contend that he was surprised by its terms. Thus, that factor weighs in favor of enforcement.

Other procedural factors, however, point in a different direction. This was not an agreement between equals. Only one party to the contract—defendant—was a commercial enterprise, and that party exercised its superior bargaining strength by requiring its patrons, including plaintiff, to sign an anticipatory release on a take-it-or-leave-it basis as a condition of using its facilities. As the *Restatement (Second) of Torts*, section 496B, explains, a release may not be enforced

"where there is such a disparity in bargaining power between the parties that the agreement does not represent a free choice on the part of the plaintiff. The basis for such

---

"The beauty and strength of the common-law system is its infinite adaptability to societal change. Recent decisions of this court are illustrative. In *Heino v. Harper*, 306 Or 347, 349-50, 759 P2d 253 (1988), the court abolished interspousal immunity, holding 'that the common-law rule of interspousal immunity is no longer available in this state to bar negligence actions between spouses.' In *Winn v. Gilroy*, 296 Or 718, 734, 681 P2d 776 (1984), the court abolished parental tort immunity for negligent injury to minor children. Nineteen years earlier, in *Wights v. Staff Jennings*, 241 Or 301, 310, 405 P2d 624 (1965), stating that 'it is the function of the judiciary to modify the law of torts to fit the changing needs of society,' the court held that a seller of a product may be held strictly liable for injuries to a plaintiff not in privity with the seller.

"The development of the common law occurs in an environment in which tensions abound. On occasion, the Legislative Assembly passes laws in response to decisions of this court. Products liability decisions of this court led to the enactment of a series of products liability statutes now found in ORS 30.900 to 30.927. A decision of this court involving an injury to a skier, *Blair v. Mt. Hood Meadows Development Corp*., 291 Or 293, 630 P2d 827, *modified*, 291 Or 703, 634 P2d 241 (1981), led to the enactment of statutes concerning skiing activities, ORS 30.970 to 30.990.

"On the other hand, this court, in deciding common-law issues presented to it, has ascertained public policy by looking to legislative enactments. The legislature is incapable of passing laws that govern every conceivable situation that might arise, however. The common-law court is the institution charged with the formulation and application of rules of governing law in situations not covered by constitution, legislation, or rules."

*Buchler v. Oregon Corrections Div.*, 316 Or 499, 518-19, 853 P2d 798 (1993) (Peterson, J., concurring).

a result is the policy of the law which relieves the party who is at such a disadvantage from harsh, inequitable, and unfair contracts which he is forced to accept by the necessities of his situation. The disparity in bargaining power may arise from the defendant's monopoly of a particular field of service, *from the generality of use of contract clauses insisting upon assumption of risk by those engaged in such a field, so that the plaintiff has no alternative possibility of obtaining the service without the clause*; or it may arise from the exigencies of the needs of the plaintiff himself, which leave him no reasonable alternative to the acceptance of the offered terms."

*Id.* comment j (emphasis added).

Also, plaintiff had no opportunity in this case to negotiate for different terms or pay an additional fee for protection against defendant's negligence. What makes the substantial disparity in the parties' bargaining positions even more significant in this circumstance is the limited number of ski areas that provide downhill skiing and snowboarding opportunities in Oregon, and the generality of the use of similar releases among that limited commercial cohort.[13] Simply put, plaintiff had no meaningful alternative to defendant's take-it-or-leave-it terms if he wanted to participate in downhill snowboarding. Although that factor is not, by itself, dispositive,

"[w]hen one party is in such a superior bargaining position that it totally dictates all terms of the contract and the only option presented to the other party is to take it or leave it, some quantum of procedural unconscionability is established. The party who drafts such a contract of adhesion bears the responsibility of assuring that the provisions of the contract are not so one-sided as to be unconscionable."

*Strand v. U.S. Bank Nat. Ass'n*, 693 NW2d 918, 925 (ND 2005).

We next consider the substantive factors that are relevant to our inquiry. The parties have identified the following relevant factors: whether enforcement of the release would cause a harsh or inequitable result; whether defendant's

---

[13] In an excerpt from the transcript of plaintiff's deposition that was included in the summary judgment record, plaintiff testified that he had never been to a ski resort where a release such as the one at issue here was not required.

recreational business operation serves an important public interest or function; and whether the release purported to disclaim liability for more serious misconduct than ordinary negligence.

We begin with the question whether enforcement of the release would cause a harsh and inequitable result to befall the releasing party, in this case, plaintiff. As discussed, this court has recognized the importance of that consideration in other cases. *See, e.g., Estey*, 324 Or at 376. As pertinent here, we conclude that the result would be harsh because, accepting as true the allegations in plaintiff's complaint, plaintiff would not have been injured if defendant had exercised reasonable care in designing, constructing, maintaining, or inspecting the jump on which he was injured. And that harsh result also would be inequitable because defendant, not its patrons, has the expertise and opportunity to foresee and control hazards of its own creation on its premises, and to guard against the negligence of its employees. Moreover, defendant alone can effectively spread the cost of guarding and insuring against such risks among its many patrons.

Those public policy considerations are embodied in the common law of business premises liability. Business owners and operators have a heightened duty of care toward patrons—invitees[14]—with respect to the condition of their premises that exceeds the general duty of care to avoid unreasonable risks of harm to others. *Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 140-41, 309 P3d 1073 (2013); *Garrison v. Deschutes County*, 334 Or 264, 272, 48 P3d 807 (2002) (business invitee rule is a "special duty"). As this court explained in *Woolston v. Wells*, 297 Or 548, 557-58, 687 P2d 144 (1984):

> "In general, it is the duty of the possessor of land to make the premises reasonably safe for the invitee's visit. The possessor must exercise the standard of care above stated to discover conditions of the premises that create an unreasonable risk of harm to the invitee. The possessor must

---

[14] An "invitee" is "[a] person who has an express or implied invitation to enter or use another's premises, such as a business visitor or a member of the public to whom the premises are held open." Bryan A Garner, *Black's Law Dictionary* 846 (8th ed 1999).

exercise that standard of care either to eliminate the condition creating that risk or to warn any foreseeable invitee of the risk so as to enable the invitee to avoid the harm."

Furthermore, a business operator's obligation to make its premises reasonably safe for its invitees includes taking into account the use to which the premises are put. *See, e.g., Ragnone v. Portland School Dist. No. 1J,* 291 Or 617, 621 n 3, 633 P2d 1287 (1981) (so stating); *Mickel v. Haines Enterprises, Inc.,* 240 Or 369, 371-72, 400 P2d 518 (1965) (owner must "take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use of the premises.").

The legislature has statutorily modified those duties to some extent in the Skier Responsibility Law, ORS 30.970 to 30.990. Under ORS 30.975, skiers assume certain risks:

"In accordance with ORS 31.600 [pertaining to contributory negligence] and notwithstanding ORS 31.620 (2) [abolishing the doctrine of implied assumption of risk], an individual who engages in the sport of skiing, alpine or nordic, accepts and assumes the inherent risks of skiing insofar as they are reasonably obvious, expected or necessary."

ORS 30.970(1) describes "inherent risks of skiing":

"'Inherent risks of skiing' includes, but is not limited to, those dangers or conditions which are an integral part of the sport, such as changing weather conditions, variations or steepness in terrain, snow or ice conditions, surface or subsurface conditions, bare spots, creeks and gullies, forest growth, rocks, stumps, lift towers and other structures and their components, collisions with other skiers and a skier's failure to ski within the skier's own ability."

ORS 30.985 prescribes the duties of skiers, which generally deal with behaving safely while skiing.

By providing that a skier assumes the "inherent risks of skiing," ORS 30.975 reduced ski area operators' heightened common law duty to discover and guard against certain natural and inherent risks of harm. However, the Skier Responsibility Law did not abrogate the common-law principle that skiers do not assume responsibility for unreasonable conditions created by a ski area operator insofar as

those conditions are not inherent to the activity. *See Nolan v. Mt. Bachelor, Inc.*, 317 Or 328, 336, 856 P2d 305 (1993) (Skier Responsibility Law provides that "[t]o the extent an injury is caused by an inherent risk of skiing, a skier will not recover against a ski area operator; to the extent an injury is a result of [ski area operator] negligence, comparative negligence applies"). It follows that the public policy underlying the common-law duty of a ski area operator to exercise reasonable care to avoid creating risks of harm to its business invitees remains applicable in this case.

In short, because (1) accepting as true the allegations in plaintiff's complaint, plaintiff would not have been injured if defendant had exercised reasonable care in designing, constructing, maintaining, or inspecting the jump on which he was injured; and (2) defendant, not its patrons, had the expertise and opportunity—indeed, the common-law duty—to foresee and avoid unreasonable risks of its own creation on its business premises, we conclude that the enforcement of the release would cause a harsh and inequitable result, a factor that militates against its enforcement.

To continue our analysis, we next consider whether defendant's business operation serves an important public interest or function. The parties sharply disagree about the importance of that factor to our resolution of this case. According to defendant, that factor is paramount here, because, as a matter of law, anticipatory releases of negligence liability are unenforceable only when a defendant provides an "essential" public service.

Although this court has not previously addressed that precise issue in the context of a release involving a recreational activity, other courts have done so. As defendant observes, courts in several jurisdictions that lack statutory prohibitions of anticipatory releases of liability for negligence have upheld such releases (at least in part) on the ground that the activity at issue did not involve an "essential" public service.[15] However, courts in other jurisdictions

---

[15] *See, e.g., Malecha v. St. Croix Valley Skydiving Club, Inc.*, 392 NW 2d 727 (Minn App 1986) (upholding an exculpatory agreement entered into between a skydiving operation and a patron); *Chepkevich v. Hidden Valley Resort*, 607 Pa 1, 2 A3d 1174 (2010) (skiing); *Pearce v. Utah Athletic Foundation*, 179 P3d 760 (Utah 2008) (bobsledding); *Benedek v. PLC Santa Monica*, LLC, 104 Cal App 4th 1351,

have taken the opposite approach, concluding that, regardless of whether the release involves an essential public service, anticipatory releases that immunize a party from the consequences of its own negligence can violate public policy or be unconscionable.

For example, in *Dalury v. S-K-I, Ltd.*, 164 Vt 329, 670 A2d 795 (1995), the Vermont Supreme Court rejected the argument that anticipatory releases of negligence liability necessarily are enforceable in the context of recreational activities because such activities are not essential. 670 A2d at 799. In that case, the plaintiff sustained serious injuries when he collided with a metal pole that formed part of the control maze for a ski-lift line. He brought a negligence action against the defendant ski area operator, alleging that it had negligently designed, built, and placed the maze pole. The trial court granted the defendant's motion for summary judgment based on an anticipatory release that the plaintiff had signed absolving the defendant of liability for negligence.

On appeal, the court noted that the release was conspicuous and unambiguous, but it nevertheless concluded that the release violated public policy. *Id.* at 797. The court began its analysis with the *Restatement (Second) of Torts* § 496B comment b, which states that an anticipatory release should be upheld if (1) it is freely and fairly made, (2) between parties who are in equal bargaining positions, and (3) there is no societal interest with which it interferes. *Dalury*, 670 A2d at 797. The parties' dispute focused on the last issue. The defendant urged the court to conclude that, because skiing—like other recreational activities—is not a necessity of life, the sale of a lift ticket is a purely private transaction that implicates no public interest. The court concluded that "no single formula will reach the relevant public policy issues in every factual context." *Id.* at 798. Rather, the court stated that it would consider "the totality of the circumstances of any given case against the backdrop of current societal expectations." *Id.*

---

129 Cal Rptr 2d 197 (2002) (health club); *Henderson v. Quest Expeditions, Inc.*, 174 SW3d 730, (Tenn Ct App 2005) (whitewater rafting).

The court found a significant public policy consideration in the case in the law of premises liability; in particular, the court stated, business owners—including ski area operators—owe a duty of care to make their premises safe for patrons where their operations create a foreseeable risk of harm. *Id*. at 799. The court observed that

"[d]efendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone can properly maintain and inspect their premises, and train their employees in risk management. They alone can insure against risks and effectively spread the cost of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.

"If defendants were permitted to obtain broad waivers for their liability, an important incentive for ski areas to manage risk would be removed with the public bearing the cost of the resulting injuries. *** It is illogical, in these circumstances, to undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control."

*Id*.

Turning to the defendant's argument that the release was enforceable because ski resorts do not provide an essential public service, the court stated that,"[w]hile interference with an essential public service surely affects the public interest, those services do not represent the universe of activities that implicate public concerns." *Id*. The court held that, "when a facility becomes a place of public accommodation, it 'render[s] a service which has become of public interest in the manner of the innkeepers and common carriers of old.'" *Id*. at 799-800 (quoting *Lombard v. Louisiana*, 373 US 267, 279, 83 S Ct 1122, 10 L Ed 2d 338 (1963)) (internal quotation marks omitted).

Finally, the court's analysis was informed by a statute that placed the "inherent risks" of any sport on the

participant, insofar as the risks were obvious and neces-sary.[16] The court stated that "[a] ski area's own negligence
* * * is neither an inherent risk nor an obvious and neces-sary one in the sport of skiing," and, therefore, "a skier's
assumption of the inherent risks of skiing does not abrogate
the ski area's duty to warn of or correct dangers which in the
exercise of reasonable prudence in the circumstances could
have been foreseen and corrected." *Dalury*, 670 A2d at 800
(internal quotation marks omitted).[17]

We, too, think that the fact that defendant does not
provide an essential public service does not compel the con-clusion that the release in this case must be enforced. As the
court stated in *Dalury*, "[w]hile interference with an essen-tial public service surely affects the public interest, those
services do not represent the universe of activities that
implicate public concerns." 670 A2d at 799. It is true that
ski areas do not provide the kind of public service typically
associated with government entities or heavily regulated
private enterprises such as railroads, hospitals, or banks.
*See Real Good Food*, 276 Or at 1061 ("Banks, like common
carriers and utility companies, perform an important public
service, and, for that very reason, are subject to state and
federal regulation."). However, like other places of public
accommodation such as inns or public warehouses, defen-dant's business premises—including its terrain park—are

---

[16] Vermont Statutes Annotated title 12, section 1037, provides:

"Notwithstanding the provisions of section 1036 of this title, a person
who takes part in any sport accepts as a matter of law the dangers that
inhere therein insofar as they are obvious and necessary."

[17] For similar reasons, the Connecticut Supreme Court also has declined to
enforce an anticipatory release of negligence liability in the face of the defendant's
contention that recreational activities do not implicate the public interest. *Hanks
v. Powder Ridge Restaurant Corp.*, 276 Conn 314, 885 A2d 734 (2005). *Hanks*
was a negligence action brought by a plaintiff who was injured when his foot was
caught between his snowtube and the artificial bank of a snowtubing run at a ski
resort operated by the defendant. The defendant relied on an anticipatory release
that the plaintiff had signed that purported to absolve the defendant from liabil-ity for its negligence. The court acknowledged that the release was conspicuous
and unambiguous, but ultimately agreed with the Vermont Supreme Court that
determining what constitutes the public interest required consideration of all
relevant circumstances, including that the plaintiff lacked sufficient knowledge
and authority to discern whether, much less ensure that, the snowtubing runs
were maintained in a reasonably safe condition. *Id.* at 331. Thus, the court held,
"it is illogical to permit snowtubers, and the public generally, to bear the costs of
risks that they have no ability or right to control." *Id.* at 332.

open to the general public virtually without restriction, and large numbers of skiers and snowboarders regularly avail themselves of its facilities. To be sure, defendants' business facilities are privately owned, but that characteristic does not overcome a number of legitimate public interests concerning their operation.[18]

The major public interests at stake are those underlying the law of business premises liability. The policy rationale is to place responsibility for negligently created conditions of business premises on those who own or control them, with the ultimate goal of mitigating the risk of injury-producing accidents. *Hagler*, 354 Or at 140-41; *Garrison*, 334 Or at 272. In that setting, where a business operator extends a general invitation to enter and engage in activities on its premises that is accepted by large numbers of the public, and those invitees are subject to risks of harm from conditions of the operator's creation, their safety is a matter of broad societal concern. *See Dalury*, 670 A2d 799 ("[W]hen a substantial number of such sales take place as a result of the [operator's] general invitation to the public to utilize the facilities and services in question, a legitimate public interest arises."). The public interest, therefore, is affected by the performance of the operator's private duties toward them. *See, e.g.*, *Strawbridge v. Sugar Mountain Resort, Inc.*, 320 F Supp 2d 425, 433-34 (WD NC 2004) (holding, under North Carolina law, that "the ski industry is sufficiently regulated and tied to the public interest" to preclude enforcement of anticipatory release, based on the principle that "a party cannot protect himself by contract[ing] against liability for negligence *** where *** public interest is involved, or where public interest requires the performance of a private duty"). Accordingly, we reject defendant's argument that the fact that skiing and snowboarding are "non-essential" activities compels enforcement of the release in this case.

---

[18] Public accommodations laws that prohibit discrimination against potential users of the facility are just one example of limitations imposed by law that affect the use of defendant's premises. *See, e.g.*, ORS 447.220 (explaining purpose of ORS 447.210-280 to make places of public accommodation accessible to persons with disability); ORS 447.210 (defining public accommodation to include "places of recreation"); ORS 659A.403 (prohibiting discrimination in places of public accommodation); ORS 659A.400 (defining places of public accommodation for purposes of ORS 659A.403 to include places offering "amusements").

Instead, we conclude that defendant's business operation is sufficiently tied to the public interest as to require the performance of its private duties to its patrons.

Finally, we consider the nature of the conduct to which the release would apply in this case. Defendant makes a fair point that, although the release purports to immunize it from liability for any misconduct short of intentional conduct, plaintiff's claim is based on ordinary negligence. Defendant notes that this court has held that an anticipatory release violates public policy where it purports to immunize the releasee from liability for gross negligence, reckless, or intentional conduct, but a release that disclaims liability only for ordinary negligence more often is enforced. *K–Lines*, 273 Or at 249. That statement is correct as a general comment on the validity of anticipatory releases, but, of course, whether any particular release will be enforced depends on the various factors that we discuss in this opinion. In the circumstances of this transaction, the fact that plaintiff's claim is based on negligence rather than on more egregious conduct carries less weight than the other substantive factors that we have considered or than it would, for example, in a commercial transaction between parties of relatively equal bargaining power.[19]

## SUMMARY AND APPLICATION

To summarize, our analysis leads to the conclusion that permitting defendant to exculpate itself from its own negligence would be unconscionable. As discussed, important procedural factors supporting that conclusion include the substantial disparity in the parties' bargaining power in the particular circumstances of this consumer transaction, and the fact that the release was offered to plaintiff and defendant's other customers on a take-it-or-leave-it basis.

There also are indications that the release is substantively unfair and oppressive. First, a harsh and inequitable result would follow if defendant were immunized from negligence liability, in light of (1) defendant's superior ability to guard against the risk of harm to its patrons arising from

---

[19] Defendant does not contend that the release would be enforceable against a claim based on alleged gross negligence or reckless conduct.

its own negligence in designing, creating, and maintaining its runs, slopes, jumps, and other facilities; and (2) defendant's superior ability to absorb and spread the costs associated with insuring against those risks. Second, because defendant's business premises are open to the general public virtually without restriction, large numbers of skiers and snowboarders regularly avail themselves of its facilities, and those patrons are subject to risks of harm from conditions on the premises of defendant's creation, the safety of those patrons is a matter of broad societal concern. The public interest, therefore, is affected by the performance of defendant's private duties toward them under business premises liability law.

In the ultimate step of our unconscionability analysis, we consider whether those procedural and substantive considerations outweigh defendant's interest in enforcing the release at issue here. *Restatement (Second) of Contracts* § 178 comment b ("[A] decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms."). Defendant argues that, in light of the inherent risks of skiing, it is neither unfair nor oppressive for a ski area operator to insist on a release from liability for its own negligence. As defendant explains,

> "[W]hen the plaintiff undertook this activity, he exposed himself to a high risk of injury. Only he controlled his speed, course, angle, 'pop' and the difficulty of his aerial maneuver. Skiing and snowboarding requires [*sic*] the skier to exercise appropriate caution and good judgment. Sometimes, even despite the exercise of due care, accidents and injuries occur."

Further, defendant contends, denying enforcement of such a release

> "improperly elevates premises liability tort law above the freedom to contract, fails to take into account the countervailing policy interest of providing recreational opportunities to the public, fails to recognize that certain recreational activities are inherently dangerous and fails to consider the fact that the ski area operator has little, if any, control over the skier/snowboarder."

Defendant's arguments have some force. After all, skiing and snow boarding are activities whose allure and risks derive from a unique blend of factors that include natural features, artificial constructs, and human engagement. It may be difficult in such circumstances to untangle the causal forces that lead to an injury-producing accident. Moreover, defendant is correct that several relevant factors weigh in favor of enforcing the release. As discussed, the release was conspicuous and unambiguous, defendant's alleged misconduct in this case was negligence, not more egregious conduct, and snowboarding is not a necessity of life.

That said, the release is very broad; it applies on its face to a multitude of conditions and risks, many of which (such as riding on a chairlift) leave defendant's patrons vulnerable to risks of harm of defendant's creation. Accepting as true the allegations in plaintiff's complaint, defendant designed, created, and maintained artificial constructs, including the jump on which plaintiff was injured.[20] Even in the context of expert snowboarding in defendant's terrain park, defendant was in a better position than its invitees to guard against risks of harm created by its own conduct.

A final point deserves mention. It is axiomatic that public policy favors the deterrence of negligent conduct. 2 *Farnsworth on Contracts* § 5.2, 9-12 ("[i]n precedents accumulated over centuries," courts have relied on policy "against the commission or inducement of torts and similar wrongs"). Although that policy of deterrence has implications in any case involving the enforceability of an anticipatory release of negligence liability, here, that policy bolsters the other considerations that weigh against enforcement of the release. As the parties readily agree, the activities at issue in this case involve considerable risks to life and limb. Skiers and snowboarders have important legal inducements to exercise reasonable care for their own safety by virtue of their statutory assumption of the inherent risks of skiing. By contrast, without potential exposure to liability for

---

[20] We reiterate that the issues of whether defendant actually was negligent in one or more of the particulars alleged by plaintiff, whether and the extent to which plaintiff was comparatively negligent, and the extent to which either party's negligence actually caused plaintiff's injuries, are not before us on review.

their own negligence, ski area operators would lack a commensurate legal incentive to avoid creating unreasonable risks of harm to their business invitees. *See Alabama Great Southern Railroad Co. v. Sumter Plywood Corp.*, 359 So 2d 1140, 1145 (Ala 1978) (human experience shows that exculpatory agreements induce a lack of care). Where, as here, members of the public are invited to participate without restriction in risky activities on defendant's business premises (and many do), and where the risks of harm posed by operator negligence are appreciable, such an imbalance in legal incentives is not conducive to the public interest.

Because the factors favoring enforcement of the release are outweighed by the countervailing considerations that we have identified, we conclude that enforcement of the release at issue in this case would be unconscionable.[21] And, because the release is unenforceable, genuine issues of fact exist that preclude summary judgment in defendant's favor. It follows that the trial court erred in granting defendant's motion for summary judgment and in denying plaintiff's cross-motion for partial summary judgment, and that the Court of Appeals erred in affirming the judgment dismissing plaintiff's action.

The decision of the Court of Appeals is reversed. The judgment of the trial court is reversed and the case is remanded to that court for further proceedings.

---

[21] By so concluding, we do not mean to suggest that a business owner or operator never may enforce an anticipatory release or limitation of negligence liability from its invitees. As explained, multiple factors may affect the analysis, including, among others, whether a legally significant disparity in the parties' bargaining power existed that made the release or limitation unfairly adhesive, whether the owner/operator permitted a patron to pay additional reasonable fees to obtain protection against negligence, the extent to which the business operation is tied to the public interest, including whether the business is open to and serves large numbers of the general public without restriction, and the degree to which the personal safety of the invitee is subjected to the risk of carelessness by the owner/operator.