Argued and submitted October 13, 2021, reversed and remanded
December 14, 2022

Thomas BROWN
and Maria Del Carmen Espindola Gomez,
individually and as parents and
natural guardians of M. B., a minor,
*Plaintiffs-Appellants,*

*v.*

GLAXOSMITHKLINE, LLC,
*Defendant,*

*and*

PROVIDENCE HEALTH SYSTEM - OREGON,
d/b/a Providence Newberg Medical Center,
f/k/a Providence Newberg Hospital,
*Defendant-Respondent.*

Multnomah County Circuit Court
15CV23066; A169544

523 P3d 132

Plaintiffs brought a strict product liability claim against defendant Providence Health System - Oregon alleging that a pharmaceutical drug that Providence emergency medical staff administered to plaintiff Gomez while she was pregnant caused her child to be born with irreparable heart defects. The trial court granted defendant's motion for summary judgment, concluding that Providence is not subject to strict product liability because it was not a "seller *** engaged in the business of selling" the drug under ORS 30.920. Plaintiffs appeal from the resulting judgment, assigning error to that ruling. *Held*: Based on the text, context, and legislative history of ORS 30.920, a "seller" of a product is one who transfers ownership of the product to another in exchange for valuable consideration and a seller is "engaged in the business of selling" a product when selling the product comprises some part of the seller's ongoing commercial activity. Plaintiffs presented sufficient evidence to create a genuine issue of material fact as to whether Providence was a "seller *** engaged in the business of selling" the drug within the meaning of ORS 30.920.

Reversed and remanded.

Gregory F. Silver, Judge.

Travis Eiva argued the cause and filed the briefs for appellants.

Michael T. Stone argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

POWERS, J.

Reversed and remanded.

**POWERS, J.**

This case requires us to decide whether a hospital that charges for a pharmaceutical drug administered to a patient in its emergency department is a "seller *** engaged in the business of selling" the drug subject to strict product liability under ORS 30.920. Plaintiffs Thomas Brown and Maria Del Carmen Espindola Gomez, individually and as guardians *ad litem* for their minor child, M, brought a strict product liability claim against defendant Providence Health System - Oregon alleging that the pharmaceutical drug Zofran, which Providence emergency medical staff prescribed and administered to Gomez while she was pregnant, caused M to be born with irreparable heart defects. The trial court granted defendant's motion for summary judgment, concluding that Providence is not subject to strict product liability under ORS 30.920 because it was not a "seller *** engaged in the business of selling" Zofran within the meaning of that statute, and the trial court entered a judgment dismissing plaintiffs' claim. Plaintiffs appeal, assigning error to that ruling.

Based on the text, context, and legislative history of ORS 30.920, we conclude that a "seller" of a product is one who transfers ownership of the product to another in exchange for valuable consideration. We further conclude that a seller is "engaged in the business of selling" a product when selling the product comprises some part of the seller's ongoing commercial activity. As we will explain, one can be a "seller *** engaged in the business of selling" a product subject to strict liability under ORS 30.920 even if the seller also or primarily provides a service and the sale of the product is incidental to that service. Finally, because we conclude that plaintiffs presented sufficient evidence to create a genuine issue of material fact as to whether Providence was a "seller *** engaged in the business of selling" Zofran within the meaning of ORS 30.920, the trial court erred in granting summary judgment.

## FACTS AND PROCEDURAL HISTORY

We review a trial court's grant of summary judgment to determine whether there is "no genuine issue as to any material fact" and whether the moving party was

"entitled to prevail as a matter of law." ORCP 47 C. We view all facts, and all reasonable inferences that may be drawn from those facts, in the light most favorable to the adverse parties, here, plaintiffs. *Id.* We state the facts consistently with that standard.

In 2006, when she was seven weeks pregnant with M, Gomez went to a Providence hospital emergency department complaining of nausea and vomiting, among other symptoms. A physician in the emergency department evaluated Gomez and prescribed 4 mg of injectable Zofran, which a nurse administered. Gomez signed a "Conditions of Service" agreement in which she agreed "to pay for the services or products provided by Providence" within 30 days of invoice. Providence billed Gomez and her insurer for the treatment that she received, which included a specific charge for Zofran.

The hospital was licensed by the state of Oregon, which required the hospital to provide emergency medical services to patients. The hospital's licensed in-house pharmacy maintained a stock of medications, including injectable Zofran. A Providence physician could order, and Providence staff would dispense, a specific medication for administration to a patient at the hospital. For patients in the emergency department, the attending physician would order a specific medication and dose for the patient, and the medication would be dispensed, either through a locked cabinet in the emergency department or through the in-house pharmacy, and administered to the patient by licensed staff. State and federal law prohibited the hospital's in-house pharmacy from selling medications to patients after discharge. The hospital did not advertise Zofran injectable or other medications for sale to patients or the general public. A member of the general public could not purchase Zofran injectable from the hospital.

In addition to claims brought against the manufacturer of Zofran, GlaxoSmithKline, LLC, who is not a party to this appeal, plaintiffs' operative complaint alleged claims for strict product liability and negligent misrepresentation against Providence.[1] As pertinent here, the amended

---

[1] Plaintiffs later withdrew the negligent misrepresentation claim.

complaint's strict product liability claim against Providence alleged that it was a "seller *** of Zofran, engaged in the business of selling Zofran[.]"

Providence moved for summary judgment and argued that there was no issue of material fact that it was not a "seller *** engaged in the business of selling" Zofran for purposes of ORS 30.920, because "[c]ommon sense tells us that hospitals are not sellers of products" but rather "quintessential service providers," and therefore are not subject to strict liability. Providence advanced four arguments in support of its construction of ORS 30.920 and summary judgment motion. First, Providence argued that its hospital cannot be a "seller" of Zofran as a matter of law because the hospital did not "market Zofran or other such medications for use or consumption." Second, Providence argued that Oregon law considers hospitals to be "engaged in the business of providing health services," including in-house pharmacy services, not sellers of pharmaceuticals. Third, Providence argued that federal price discrimination law recognizes that "a hospital purchases medications for its own use as part of the provision of medical services, and does not make a separate sale to a patient when it administers such drugs." Finally, Providence argued that Oregon should follow "the majority of other jurisdictions" that have "routinely concluded that hospitals are not appropriate defendants in strict product liability actions because hospitals are not in the business of selling products such as drugs or medical devices."

The trial court granted Providence's motion for summary judgment. The court concluded that, "under the specific facts of this case," Providence was not "engaged in the business of selling Zofran." The court reasoned that the hospital's in-house pharmacy was authorized under Oregon law to store drugs to be administered to patients in the course of treatment, but not to sell pharmaceutical drugs to a consumer for use off site. Thus, the court reasoned, Providence was not engaged in the business of selling any drug provided by its hospital's in-house pharmacy that could only be administered on site. Accordingly, the court concluded that Providence was not "engaged in the business of selling Zofran" because its hospital's in-house pharmacy

dispensed injectable Zofran to Gomez to be administered in the course of treatment at the hospital.

On appeal, plaintiffs raise a single assignment of error challenging the trial court's summary judgment ruling. Plaintiffs contend that nothing in the text or context of ORS 30.920 indicates that a hospital that sells pharmaceuticals from its in-house pharmacy is exempt from strict product liability. Providence asks this court to affirm the judgment dismissing plaintiffs' strict liability claim and reprises the arguments that it made before the trial court in support of its summary judgment motion.

## LEGAL BACKGROUND

Before we begin the task of construing the disputed terms of ORS 30.920, we begin with a brief overview of Oregon's product liability statutory framework generally and of strict product liability in particular.

ORS 30.900 defines a "product liability civil action" as:

"[A] civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of:

"(1)   Any design, inspection, testing, manufacturing or other defect in a product;

"(2)   Any failure to warn regarding a product; or

"(3)   Any failure to properly instruct in the use of a product."

A "product liability civil action" defined in ORS 30.900 "embraces all theories a plaintiff can claim in an action based on a product defect," including negligence and strict liability claims. *Kambury v. DaimlerChrysler Corp.*, 185 Or App 635, 639, 60 P3d 1103 (2003). The statutory framework governing product liability civil actions consists of an exception for certain products provided by physicians (ORS 30.902), general and specific limitations on the time to commence an action (ORS 30.905, ORS 30.907, ORS 30.908, and ORS 30.928), an evidentiary presumption (ORS 30.910), defenses (ORS 30.915), a cause of action for strict product

liability (ORS 30.920), and recoverable punitive damages (ORS 30.925 and ORS 30.927).

ORS 30.920 sets out the elements of a strict product liability claim:

"(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a)   The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b)   The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2)   The rule stated in subsection (1) of this section shall apply, even though:

"(a)   The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b)   The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

"(3)   It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

"(4)   Nothing in this section shall be construed to limit the rights and liabilities of sellers and lessors under principles of common law negligence or under ORS chapter 72 [(Uniform Commercial Code-Sales)]."

Before the legislature enacted ORS 30.920, strict product liability was governed by the common law. *McCathern v. Toyota Motor Corp.*, 332 Or 59, 72, 23 P3d 320 (2001). In 1967, the Oregon Supreme Court adopted section 402A of the *Restatement (Second) of Torts* (1965) as the common law standard for strict product liability claims.[2] *Id.* (citing *Heaton*

---

[2] All references to section 402A in this opinion are to the *Restatement (Second) of Torts* (1965).

*v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967)). At that time, strict liability in tort was still "at the infant stage" and liability "for injuries caused by defective products was based on concepts relating to contractual warranties." *Royer v. Miles Laboratory, Inc.*, 107 Or App 112, 115, 811 P2d 644 (1991). In *Heaton*, the court noted that the definition of strict product liability in section 402A was "conceptually related to the traditional warranty of merchantable quality in the law of sales." *Heaton*, 248 Or at 471. Practitioners did not immediately recognize strict liability as a distinct theory and could plead a strict liability claim by alleging a breach of an implied warranty as late as 1971. *Royer*, 107 Or App at 115-16 (citing *Markle v. Mulholland's, Inc.*, 265 Or 259, 509 P2d 529 (1973)).

As the common law developed, the Supreme Court indicated that it could exercise considerable discretion in applying section 402A because it did not have the force of statute. *McCathern*, 332 Or at 74 (citing *Allen v. The Heil Company*, 285 Or 109, 119 n 5, 589 P2d 1120 (1979)). The impetus for codifying product liability arose from concerns about rising costs of liability insurance, which business groups attributed to "the unpredictability of potential exposure in what was then a rapidly evolving branch of the law." *Ewen v. McLean Trucking Co.*, 300 Or 24, 28, 706 P2d 929 (1985) (citing Dominick Vetri, *Legislative Codification of Strict Products Liability Law in Oregon*, 59 Or L Rev 363 (1981)). Specifically, the "sense of uncertainty concerned cases decided in other states which [the Oregon Supreme Court] might or might not follow." *Ewen*, 300 Or at 28.

The 1979 legislature sought to address the concerns of business groups and their insurers, who wanted to "stabilize the rules of liability," but at the same time "not reduce the financial protections under existing Oregon law for persons injured by dangerous products." *Id.* The legislature ultimately enacted ORS 30.920, which codified section 402A with some important modifications—all of which broadened the scope of liability beyond the text of section 402A. *Ewen*, 300 Or at 28-29. First, ORS 30.920 applies strict liability to product leasing transactions, even though section 402A does not. Second, ORS 30.920 protects "the user, consumer, or injured party," whereas section 402A protects the user

or consumer only and "expresses no opinion as to whether the rule in this Section may not apply to harm to persons other than users or consumers." Third, ORS 30.920 omits the three caveats in section 402A (*i.e.*, taking no position on liability to bystanders, liability of component part manufacturers, or liability of original manufacturers where the product will be processed or substantially changed before it reaches the user or consumer) and comment n (concerning contributory negligence and assumption of risk).

Since 1979, product liability claims in Oregon have been governed exclusively by the statutory framework, not the common law. *Griffith v. Blatt*, 334 Or 456, 466, 51 P3d 1256 (2002) (declining to adopt the learned intermediary doctrine into Oregon strict liability law because "Oregon statutes, not the common law, govern" strict liability claims and defenses, and explaining that the analysis "begins and ends with our construction of the pertinent product liability statutes"). Thus, the text of ORS 30.920, read in accordance with section 402A, comments a to m, has been the lodestar for determining who constitutes a "seller" "engaged in the business of selling." *See, e.g.*, *Lancaster v. Hartzell*, 54 Or App 886, 891 n 3, 637 P2d 150 (1981), *rev den*, 292 Or 722 (1982) (relying on section 402A and comment f while noting that the case was tried before section 402A was codified in ORS 30.920).

## ANALYSIS

With that legal background in mind, we turn to the specific question presented in this case, which is ultimately one of statutory interpretation. In construing a statute, we examine the text of the statute in context, considering any relevant legislative history, and, if necessary, applying maxims of statutory construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Our duty when interpreting a statute is "simply to ascertain and declare what is, in terms or in substance, contained therein," ORS 174.010, and to "pursue the intention of the legislature if possible," ORS 174.020.

We begin with the statutory text and its context, which are the "best indications of the legislature's intent."

*State v. Walker*, 356 Or 4, 13, 333 P3d 322 (2014). ORS 30.920 applies strict liability to "one who sells * * * a product" if they are a "seller * * * engaged in the business of selling * * * such a product."

We typically give "words of common usage" their "plain, natural, and ordinary meaning." *PGE*, 317 Or at 611; *cf. Mason v. Mt. St. Joseph, Inc.*, 226 Or App 392, 399-400, 203 P3d 329, *rev dismissed*, 347 Or 349 (2009) (construing "distributor" and "manufacturer" in ORS 30.900 as words of common usage). "Sell"—the root to "sells," "seller," and "selling"—means "to give up (property) to another for money or other valuable consideration : hand over or transfer title to (as goods or real estate) for a price" and "to offer for sale : deal in as an article of sale." *Webster's Third New Int'l Dictionary* 2061 (unabridged ed 2002); *see also id.* at 2062 (defining "seller" as "one that offers for sale"); *id.* at 2003 (defining "sale" as "the act of selling : a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)); *id.* at 2062 (defining "selling" as "the act or occupation of one who sells" and "the act, process, or art of offering goods for sale"). Thus, under the ordinary meaning of those terms, one "sells" a product when one transfers ownership of the product to another in exchange for valuable consideration; a "seller" is one who carries out such a transfer; and "selling" is the act or process of such a transfer.

"Engaged" as an intransitive verb means "to begin and carry on an enterprise, esp. a business or profession," "to employ or involve oneself," and "to take part : PARTICIPATE." *Webster's* at 751. "Business" means "a usu. commercial or mercantile activity customarily engaged in as a means of livelihood and typically involving some independence of judgment and power of decision." *Id.* at 302. And the preposition "of" is used in the sense "as a function word to indicate the material, parts, or elements composing something or the contents held by something." *Id.* at 1565. Thus, under the ordinary meaning of those terms, a seller is "engaged in the business of selling" a product if the seller carries on commercial activity composed in part of the act of selling the product, *viz.*, transferring ownership of the product to

another in exchange for valuable consideration.[3] Contrary to defendant's argument before the trial court and on appeal, nothing in the text of ORS 30.920 indicates that the seller must be solely or primarily in the business of selling the product.[4]

ORS 30.920(3) expresses a "legislative mandate" to "construe the substantive formulas codified in subsections (1) and (2) 'in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965).'" *McCathern*, 332 Or at 75. Comment f specifically addresses the "business of selling," and it is consistent with the ordinary meaning of that phrase that we have identified. Specifically, comment f explains that the rule "applies to any person engaged in the business of selling products for use or consumption" and that "[i]t is not necessary that the seller be engaged solely in the business of selling such products." *Id.* In explaining that the rule does not apply to the occasional seller "who is not engaged in that activity as part of [the seller's] business," comment f provides:

> "f. *Business of selling*. The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the

---

[3] The ordinary meaning of "seller *** engaged in the business of selling" that we have identified is consistent with our case law construing those terms in other factual contexts. *See, e.g.*, *Mason*, 226 Or App at 400 (holding that "occasional and noncommercial actions" are not sales in the usual course of business subject to strict product liability); *Watts v. Rubber Tree, Inc.*, 118 Or App 557, 562-63, 848 P2d 1210, *opinion adh'd to as modified on recons*, 121 Or App 21, 853 P2d 1365, *rev den*, 317 Or 272 (1993) (holding that the installation of a defective product is not a sale of a product subject to strict liability); *Two Two v. Fujitec Am., Inc.*, 256 Or App 784, 797, 305 P3d 132 (2013), *aff'd in part and rev'd in part*, 355 Or 319, 325 P3d 707 (2014) (explaining that "ORS 30.920 does not apply to simple service transactions" that do not involve the sale of a product).

[4] The ordinary meaning of "engaged in the business of selling" that we have identified is also consistent with *Vierra v. Clackamas County*, 309 Or 243, 785 P2d 757 (1990). In that case, which was decided before *PGE* and *Gaines*, the Oregon Supreme Court construed the phrase "business engaged in the application of pesticides upon property of another" in ORS 634.006 to mean that commercial pesticide application "must at least be a part, no matter how small, of the business in which the defendant is 'engaged.'" 309 Or at 247. The court explained that "[o]ne engages in the business of applying pesticides to the land or property of another if part of the earnings of one's business comes from that source." *Id.*

business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.

"The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the [homemaker] who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2-314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like."

*Restatement* § 402A comment f.

The first paragraph of comment f explains who falls within the scope of a seller "engaged in the business of selling" a product, while the second paragraph explains who does not. Consistent with the ordinary meaning of "engaged in the business of selling," the first paragraph of comment f expressly provides that a seller need not be "engaged solely" in the business of selling a product to be held strictly liable. And the example of the movie theater owner selling concessions indicates that the rule applies to the sale of a product that is incidental to providing a service and that is consumed on the premises. The second paragraph of comment f explains the limits to the rule: The seller must sell the product in the usual course of business, and the particular sale

at issue must be in the usual course of business. Comment f explains the rule's rationale as the "special responsibility" for public safety that a seller undertakes by engaging in the business of supplying products to the general public and the general public's corresponding "forced reliance" on such suppliers in contemporary consumer society. That rationale is present only for a seller who sells a product in the usual course of a commercial enterprise.

Providence first argues that comments c and f, as we interpreted and applied them in *Mason*, place two additional limits on who is a "seller * * * engaged in the business of selling": that the seller must (1) "advertise, promote, or package the product" for use and consumption and (2) be either a "wholesaler or retail dealer."

We reject that argument. *Mason* held that the "solitary and noncommercial reuse" of products that allegedly caused harm did not render the defendant in that case a type of "seller" of those products under ORS 30.920 and clarified that the defendant was not a "seller" simply because it sold similar products to others. *Id*. at 400-02. In reaching that conclusion, *Mason* cited comment c, which restates the rationale underlying strict liability—that "by marketing [the] product for use and consumption," the seller has undertaken the aforementioned "special responsibility"—and comment f, which explains that strict liability applies "to any wholesale or retail dealer or distributor." 226 Or App at 400-01. We read comment c, as we did in *Mason*, to use the word "market" simply as a synonym for "sell." *See Webster's* at 1383 (defining the transitive verb "market" as "to expose for sale in a market : traffic in : sell in a market" and "SELL"). And comment f provides that strict liability applies "to any wholesale or retail dealer or distributor" as part of a nonexclusive list of types of "sellers." In any event, we understand the reference to a "retail dealer" in comment f as simply one who sells in small quantities to the consumer, as opposed to the colloquial sense of a brick-and-mortar shop that offers goods for sale to the general public. *See Webster's* at 1938 (defining the adjective "retail" as "of, relating to, or engaged in the sale of commodities at retail," and the noun "retail" as "the sale of commodities or goods in small quantities to

ultimate consumers—opposed to WHOLESALE"). Accordingly, we conclude that *Mason* and its discussion of comments c and f do not support defendant's argument.

The ordinary meaning of a "seller * * * engaged in the business of selling" a product, in accordance with section 402A, comment f, is one who carries on commercial activity composed in some part of transferring ownership of the product to another in exchange for valuable consideration. Although the seller must sell the product in the usual course of business, the seller need not solely or primarily engage in the business of selling the product. And comment f strongly suggests that strict liability applies to the sale of products that are incidental to a service transaction and to products that are consumed on site.

Providence next argues that it cannot be a "seller" for purposes of ORS 30.920 because Oregon and federal law recognize that hospitals are service providers that do not sell pharmaceuticals to patients but rather "use," "dispense," and "administer" them in the course of treatment. In support of that argument, Providence points to various Oregon statutes regulating hospitals and the professional practice of pharmacy, as well as a case decided by the Supreme Court of the United States interpreting a federal price discrimination statute.

We do not find those authorities persuasive for interpreting the text of ORS 30.920 because they are not sufficiently related to the subject matter of product liability. *See State v. Delaurent*, 320 Or App 191, 196, 514 P3d 113, *rev den*, 370 Or 303 (2022) (noting that the context of the statute "includes other provisions of the same statute as well as other related statutes"). That ORS 442.015 (15)(a)(D) defines a "hospital" for purposes of ORS chapter 442 as a facility that provides pharmacy "health services" does not preclude as a matter of law or fact that a hospital may also "sell" pharmaceutical drugs or be a "seller" "engaged in the business of selling" a drug within the meaning of ORS 30.920. The same is true for a hospital that "dispenses" or "administers" pharmaceutical drugs out of its "institutional drug outlet" licensed for purposes of the professional practice of pharmacy, *see* ORS 689.005(1), (9), and

(15), and for a nonprofit hospital that purchases supplies for its "own use" for purposes of an exemption to a federal price discrimination statute, *see Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.*, 425 US 1, 8-11, 96 S Ct 1305, 47 L Ed 2d 537 (1976). Those statutes define terms of art that apply to their respective statutory contexts, and there is no indication that they have any bearing on the meaning of ORS 30.920.

That conclusion is further bolstered by the existence of Oregon statutes that expressly exclude certain products and sellers from strict liability. For instance, one statute excludes products provided by physicians in certain circumstances:

"A physician licensed pursuant to ORS chapter 677 is not a manufacturer, distributor, seller or lessor of a product for the purposes of ORS 30.900 to 30.920 if the product is provided by the physician to a patient as part of a medical procedure and the physician was not involved in the design or manufacture of the product."

ORS 30.902. Another statute excludes health care facilities that provide breast implants under certain circumstances:

"A health care facility licensed under ORS chapter 441 is not a manufacturer, distributor, seller or lessor of a breast implant for the purposes of ORS 30.900 to 30.920 if the implant is provided by the facility to a patient as part of a medical implant procedure."

ORS 30.908(5).

Although both ORS 30.902 and ORS 30.908 were enacted much later than ORS 30.920 and are, therefore, not indicative of the legislature's intent on the meaning of the terms used in ORS 30.920, construing ORS 30.920 to exclude those who sell products in the provision of services would render both ORS 30.902 and ORS 30.908(5) superfluous. *See* ORS 174.010 (specifying that, "where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all"); *State v. Rusen*, 369 Or 677, 699, 509 P3d 628 (2022) (explaining that "when multiple statutory provisions potentially conflict, if the court can give full effect to both statutes, it will do so" (internal quotation marks and citation omitted)). Moreover,

ORS 30.902 and ORS 30.908(5) demonstrate that the legislature knows how to expressly exclude certain sellers and products from strict liability. The legislature could have—but did not—expressly exclude a hospital licensed under ORS chapter 442 or pharmaceutical drugs dispensed or administered under ORS chapter 677 from strict liability.[5]

A third statute, *former* ORS 97.300 (1991), *renumbered as* ORS 97.968 (1995) *and renumbered as* ORS 97.985 (2007), precludes strict liability under ORS 30.920 by declaring that transactions in certain products do not constitute sales. *Royer*, 107 Or App at 117.[6] The plaintiff in *Royer* was a hemophiliac who alleged that he had been infected with hepatitis and AIDS by a blood product. *Id*. at 114. The trial

---

[5] Indeed, the 2009 legislature declined to expressly exclude hospitals from strict liability. The exception that now exists in ORS 30.902 was originally enacted in 1993 and was limited to physicians that provided breast implants to patients as part of a medical implant procedure. Or Laws 1993, ch 259, § 5 (codified as ORS 30.908(5) (1993)). The same bill created the nearly identical exception for health care facilities that now exists in ORS 30.908(5). Or Laws 1993, ch 259, § 5 (codified as ORS 30.908(6) (1993)).

In 2009, the legislature amended ORS 30.908 by removing the exception for physicians in subsection (5) and renumbering the health care facilities exception as subsection (5). Or Laws 2009, ch 485, § 10. In the same bill, the legislature reformulated and broadened the exception for physicians and made it part of the product liability statutory framework. Or Laws 2009, ch 485, §§ 8, 9 (codified as ORS 30.902). The legislature did not adopt a proposed amendment to that bill that would have added hospitals to the reformulated exception for physicians now codified as ORS 30.902. *See* Exhibit 1 (Proposed Amendments to B-Engrossed Senate Bill 284), House Rules Committee, SB 284, June 2, 2009 ("SECTION 9. A physician licensed pursuant to ORS chapter 677, *or a hospital* as defined by ORS 442.015, is not a manufacturer, distributor, seller or lessor of a product for the purposes of ORS 30.900 to 30.920 if the product is provided by the physician *or hospital* to a patient as part of a medical procedure and the physician *or hospital* was not involved in the design or manufacture of the product." (Emphases added.)). Thus, although it is true that legislative inaction is not a good indicator to discern legislative intent—especially when considering a potential amendment that the legislature took up long after ORS 30.920 was enacted—it is at least noteworthy that the legislature had an opportunity to enact the interpretation defendant's argument advances and declined to do so. *Compare State v. Rainoldi*, 351 Or 486, 492, 268 P3d 568 (2011) (explaining that, because of the possibility of competing inferences, "statutory silence alone is not a sufficiently clear indication of legislative intent") *with State v. Partain*, 349 Or 10, 20, 239 P3d 232 (2010) (concluding that the "history of the amendment confirms that general sense of the legislature's intentions," even though there was nothing in the legislative history that established a legislative intent).

[6] *Former* ORS 97.300 (1991), which was first enacted in 1969, *see* Or Laws 1969, ch 271, § 1, was not amended until 1995, when it was also renumbered, *see* Or Laws 1995, ch 717, § 11. Accordingly, we omit the year in all remaining references to *former* ORS 97.300 in this opinion.

court dismissed the plaintiff's strict liability claims against the product's manufacturer and the seller,[7] after concluding that *former* ORS 97.300 precluded liability under the circumstances. *Former* ORS 97.300 provided:

> "(1)   The procuring, processing, furnishing, distributing, administering or using of any part of a human body for the purpose of injecting, transfusing or transplanting that part into a human body is not a sales transaction covered by an implied warranty under the Uniform Commercial Code or otherwise.
>
> "(2)   As used in this section, 'part' means organs, tissues, eyes, bones, arteries, blood, other fluids and any other portions of a human body."

We first examined the context of *former* ORS 97.300 and noted that it was enacted when strict product liability was still emerging as a conceptually related but not completely distinct theory to traditional contractual warranties. *Royer*, 107 Or App at 115-16. We then examined the legislative history of *former* ORS 97.300 and explained that the legislature enacted it in response to a Florida case that had held that blood suppliers could be held liable without fault. *Id.* at 116. In the Florida case, the plaintiff sued a blood bank claiming breach of implied warranties after she contracted hepatitis from a blood transfusion. *Id.* (citing *Russell v. Community Blood Bank, Inc.*, 185 So 2d 749, 750 (Fla App 1966), *aff'd in part*, 196 So 2d 115 (Fla 1967)). We explained:

> "The [*Russell*] court recognized that courts in other states that had considered the issue had declared the furnishing of blood to be a service, not a sale. However, the court noted:
>
> > "'It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision.'
>
> "The [*Russell*] court held that a sale had occurred, thus making the blood bank susceptible to liability without fault."

---

[7] The State of Oregon, through Oregon Health Sciences Hemophilia Center, did not dispute that it had sold the blood product to the plaintiff. *Id.*

*Royer*, 107 Or App at 116 (internal citation omitted). We then pointed to several statements by legislators that the intent of *former* ORS 97.300 was to create an exemption to strict liability by excluding such products from sales transactions as a matter of law. *Id.* at 116-17. We concluded that "[t]he main focus of [*former*] ORS 97.300 is on declaring that the transactions do not constitute sales. Because strict liability cannot arise without there having been a sale, defendants could not be strictly liable." *Id*. at 117.

Thus, in addition to the express exceptions that exist within the product liability statutory framework, the legislature may also express the intent to exclude certain products or sellers from strict liability by declaring that transactions in such products do not constitute sales, as it did in *former* ORS 97.300. None of the statutes Providence cites affirmatively exclude hospitals or pharmacies from sales transactions, and Providence has cited no legislative history that evinces an intent to so exclude them.

Providence's final argument urges this court to follow the "vast majority of courts who have construed the same or similar language as that contained in ORS 30.920 [and] held that hospitals are not 'sellers' who are 'in the business of selling' products." Providence cites two cases that had been decided by the time the legislature enacted ORS 30.920 and could arguably be relevant context. *See Lindell v. Kalugin*, 353 Or 338, 349, 297 P3d 1266 (2013) ("Case law existing at the time of the adoption" of the rule or statute "forms a part of the context."). The first, *Perlmutter v. Beth David Hospital*, 308 NY 100, 108, 123 NE2d 792 (1954), held that a blood transfusion supplied by a hospital for a price did not constitute a "sale" and therefore could not give rise to a strict product liability claim on a theory of breach of implied warranty. The other, *Magrine v. Krasnica*, 94 NJ Super 228, 242, 227 A2d 539 (Co 1967), *aff'd sub nom Magrine v. Spector*, 53 NJ 259, 250 A2d 129 (1969), declined to extend strict liability to a dentist for personal injuries caused by a hypodermic needle that broke in the plaintiff patient's jaw during an injection procedure.

We do not find those cases to be persuasive context for interpreting ORS 30.920. Both cases were decided under

the common law of their respective states and predate section 402A. Moreover, even assuming that the legislature was aware of those cases when it enacted ORS 30.920, there is no indication that the legislature incorporated the holdings into the statute's text. Indeed, if the legislature responded to the holding in *Perlmutter* at all, it was to exclude certain products from liability in *former* ORS 97.300, not to exclude all sale-service hybrid transactions. And the holding of *Magrine*, if not its reasoning, is consistent with the ordinary meaning of "seller *** engaged in the business of selling" and with comment f.

To summarize, the ordinary meaning of a "seller *** engaged in the business of selling" a product, in accordance with section 402A, comment f, is one who transfers ownership of the product to another in exchange for valuable consideration and whose ongoing commercial activity consists in some part of selling the product. One can be a "seller *** engaged in the business of selling" a product subject to strict liability under ORS 30.920 even if the seller also or primarily provides a service, the sale of the product is incidental to that service, and the product is immediately consumed on site. The relevant context and legislative history confirm that interpretation.

## APPLICATION

With the proper construction of ORS 30.920, we return to the facts of this case. Here, we conclude that plaintiffs presented sufficient evidence to create a genuine issue of material fact as to whether Providence was a "seller *** engaged in the business of selling" Zofran within the meaning of ORS 30.920. Viewed in the light most favorable to plaintiffs as the adverse parties, the summary judgment record shows that Providence transferred Zofran to Gomez for valuable consideration when Providence administered the drug to her in its emergency department and later charged her for the drug as part of the services rendered. The summary judgment record further shows that Providence's ongoing commercial activity consisted in some part of selling Zofran because it maintained a stock of injectable Zofran to administer to patients in the hospital, and it is reasonable to infer that Providence would charge patients for the drug

as part of medical services it provided. Accordingly, the trial court erred in granting summary judgment for defendant.

Reversed and remanded.