No. 11 May 2, 2024 225

IN THE SUPREME COURT OF THE
STATE OF OREGON

PROVIDENCE HEALTH SYSTEM - OREGON,
*Petitioner on Review,*

*v.*

Thomas BROWN,
*Respondent on Review,*

*and*

Maria Del Carmen Espindola GOMEZ,
*Respondent on Review.*
(CC 15CV23066) (CA A169544) (SC S070082)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 9, 2023.

David R. Fine, K&L Gates LLP, Harrisburg, Pennsylvania, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Elizabeth H. White, K&L Gates, LLP, Portland, and Robert B. Mitchell, K&L Gates, LLP, Seattle, Washington.

Travis Eiva, Eiva Law, Eugene, argued the cause and filed the brief for respondents on review.

Hillary A. Taylor, Keating Jones Hughes, P.C., Portland, filed the brief for *amicus curiae* Oregon Association of Hospitals and Health Systems.

Keith J. Bauer, Parks, Bauer, Sime, Winkler & Walker, LLP, Portland, filed the brief for *amicus curiae* Salem Health Hospitals & Clinics. Also on the brief was Michael Walker.

Shayna M. Rogers, Cosgrave Vergeer Kester, LLP, Portland, filed the brief for *amici curiae* Oregon Medical Association and American Medical Association.

------------
\* Appeal from Multnomah County Circuit Court, Gregory F. Silver, Judge. 323 Or App 214, 523 P3d 132 (2022).

David W. Cramer, MB Law Group, LLP, Portland, filed the brief for *amicus curiae* Oregon Association of Defense Counsel.

Sage R. Vanden Heuvel, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, filed the brief for *amici curiae* The Chamber of Commerce of the United States of America and The Oregon Liability Reform Coalition.

Kristi Gifford, Callahan Law Office, Milwaukie, filed the brief for *amicus curiae* Oregon Trial Lawyers Association. Also on the brief was Kirc Emerson, Richardson Wang, LLP, Portland.

FLYNN, C.J.

The decision of the Court of Appeals is affirmed. The judgment of the trial court is reversed, and the case is remanded to the trial court for further proceedings.

**FLYNN, C.J.**

The Oregon legislature long ago codified a rule of strict product liability that applies to "[o]ne who sells" an unreasonably dangerous, defective product, if the seller is "engaged in the business of selling" such a product. ORS 30.920(1). At issue in this case is whether that statute applies to a hospital that supplies and administers a drug that causes harm. The trial court concluded that the statute was inapplicable under those circumstances and, on that basis, granted the hospital-defendant's motion for summary judgment. The Court of Appeals disagreed with the trial court's construction of the statute and reversed and remanded. *Brown v. GlaxoSmithKline, LLC*, 323 Or App 214, 523 P3d 132 (2022). This court allowed review, and we now affirm the decision of the Court of Appeals. As we will explain, we conclude that (1) the legislature did not intend to exclude hospitals from the scope of ORS 30.920(1); (2) a hospital that supplies and administers a dangerously defective drug in conjunction with providing a healthcare service can be a "seller" that is "engaged in the business of selling" for purposes of liability under ORS 30.920; and, consequently, (3) the trial court erred in granting the motion for summary judgment. Thus, we affirm the decision of the Court of Appeals, reverse the trial court's judgment, and remand for further proceedings.

## I.   BACKGROUND

On review of a grant of summary judgment, this court views "all parts of the record" before the court in the light most favorable to the nonmoving party—here plaintiffs, Brown and Gomez. *Two Two v. Fujitec America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014); ORCP 47 C. We describe the pertinent facts consistent with that standard.

Brown and Gomez are the parents of M, who suffered irreparable heart defects as a result of *in utero* exposure to the drug Zofran, which Providence Health System - Oregon administered to Gomez. Gomez was seven weeks pregnant with M when she went to the emergency room of Providence's Newberg Medical Center complaining of nausea, vomiting, and other symptoms. A Providence emergency

department physician evaluated Gomez and prescribed her four milligrams of injectable Zofran, which a Providence nurse administered. That prescription was fulfilled by Providence's internal pharmacy. Because the parties do not dispute that the physician, nurse, and pharmacy's actions are attributable to Providence, we refer to those individuals and institutions collectively as Providence.

As part of her emergency department visit, Gomez signed a "Conditions for Services" form, which stated that she agreed "to pay for the services or products provided by Providence." Providence billed Gomez specifically for the emergency room visit. Although that bill did not list a specific charge for Zofran, the parties agree that Gomez was prescribed and administered Zofran as part of her emergency room visit for which the bill was sent. Gomez later gave birth to M, who was diagnosed with irreparable heart defects.

Brown and Gomez brought suit as plaintiffs, on their own behalf and as guardians *ad litem* for M, against Providence, as well as against the manufacturer of Zofran.[1] As pertinent to this appeal, plaintiffs asserted a claim for strict liability under ORS 30.920, alleging that Providence was a "seller" of Zofran "engaged in the business of selling Zofran and products of the kind," that Providence "sold, distributed, vended, administered and/or supplied Zofran" to Gomez while she was pregnant with M, that Zofran was "unreasonably dangerous and defective" in multiple ways, and that, as a result of the defective condition of Zofran, M "suffers from permanent and life-threatening congenital heart defects."[2]

Providence moved for summary judgment, contending that, as a matter of law, "[a]s a provider of health services, [Providence] is neither a seller in the business of selling Zofran injectable nor is it a distributor of Zofran," so it could not be subject to liability under ORS 30.920. Although Providence did not dispute that it supplied and

---

[1] Plaintiffs' claims against the manufacturer of Zofran, GlaxoSmithKline, LLC, are not before this court.

[2] Plaintiffs voluntarily withdrew an additional claim for negligent misrepresentation that they also had alleged against Providence.

administered Zofran to Gomez, it emphasized that "[t]he undisputed evidence in this case establishes plaintiff Gomez came to [Providence] not to purchase Zofran injectable or any other medication but for the provision of emergency medical services." Providence also emphasized that it supplies drugs like Zofran through its in-house "institutional drug outlet" (or internal pharmacy), which—unlike a retail pharmacy—dispenses Zofran and other drugs only for physicians to administer to a patient in the hospital. Providence argued that the legislature did not intend ORS 30.920 "to create a new statutory claim against hospitals for products used in the course of providing health services to patients." The trial court agreed and granted Providence's motion.

The Court of Appeals reversed. The court concluded that "one 'sells' a product" within the meaning of ORS 30.920 "when one transfers ownership of the product to another in exchange for valuable consideration; a 'seller' is one who carries out such a transfer; and 'selling' is the act or process of such a transfer." *Brown*, 323 Or App at 223. That court also construed "seller engaged in the business of selling" to mean one who "carries on commercial activity composed in part of the act of selling the product, *viz.*, transferring ownership of the product to another in exchange for valuable consideration." *Id.* at 223-24. Accordingly, the Court of Appeals concluded that, under the facts alleged, one could determine that "Providence was a 'seller * * * engaged in the business of selling' within the meaning of ORS 30.920" when Providence provided Zofran to Gomez for valuable consideration, and when Providence kept a stock of Zofran in its internal pharmacy for distribution to patients. *Id.* at 232-33.

Providence then petitioned for review, which we allowed.

## II.   ANALYSIS

Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party—here Providence—is entitled to judgment as a matter of law. ORCP 47. Here, Providence sought summary judgment on the basis that, as a matter of law, this case fails to satisfy two of the requirements for strict liability under ORS

30.920. Providence contends that it did not "sell" the Zofran to Gomez, within the meaning of ORS 30.920, because it did not transfer "the full panoply of rights attendant to ownership" in the dose of Zofran when it administered the drug to Gomez. Providence also contends that it is not a "seller * * * engaged in the business of selling" Zofran, either because the legislature did not intend the statute to apply when the "essence of the transaction" with a consumer is providing a service, or because the legislature did not intend the statute to apply to hospitals. Plaintiffs disagree. They urge this court to adopt the Court of Appeals' construction of the statute and conclude that, under the plain terms of ORS 30.920, hospitals are sellers of drugs when they dispense drugs through their internal pharmacy.

The parties' arguments raise questions of statutory construction that we resolve by employing the analytical framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Under that framework, we examine the text and context of ORS 30.920, together with legislative history to the extent that it aids our analysis, all with the "paramount goal" of determining the legislature's intent. *Gaines*, 346 Or at 171-72.

As we will explain, our examination of the text, context, and legislative history of ORS 30.920 leads us to the following conclusions about the legislature's intent: "Sells" includes transactions of the type through which Providence both supplied and administered the Zofran to Gomez, and a hospital that charges for supplying a dangerously defective drug in conjunction with providing a healthcare service can be a "seller" that is "engaged in the business of selling" for purposes of strict liability under ORS 30.920. Accordingly, we agree with the Court of Appeals that the trial court erred in granting Providence's motion for summary judgment.

A.   *Statutory Construction*

1.   *Text and context*

Plaintiffs' strict liability claim is governed by ORS 30.920. As pertinent, that statute describes the requirements for strict products liability in Oregon:

> "(1)  One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:
>
> "(a)  The seller or lessor is engaged in the business of selling or leasing such a product."

The statute also specifies how questions about those requirements should be resolved:

> "(3)  It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)."

We turn first to the parties' dispute over the meaning of the terms "sells," and "seller," neither of which is defined, before addressing what it means to be "engaged in the business of selling." When determining what the legislature intended an undefined statutory term to mean, "it is helpful to understand" how the term was used when the legislature enacted the statute. *Marshall v. PricewaterhouseCoopers, LLP*, 371 Or 536, 540, 539 P3d 766 (2023). If the term is one of common usage, we generally presume that the legislature intended the ordinary meaning of the term, for which we often consult contemporaneous dictionaries. *Id.* at 540-41; *see also Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014) (observing that "we frequently consult dictionary definitions of the terms, on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended"); *id*. at 296 n 7 (noting that this court relies on dictionaries "contemporaneous with the enactment of the statute").

"But if the context or legislative history of a statute indicate that the legislature intended a term to have a meaning drawn from a specialized trade or field, so-called terms of art, we consider the meaning and usage of those terms in the discipline from which the legislature borrowed them." *Marshall*, 371 Or at 541 (internal quotation marks omitted). And for terms drawn from the legal field, we often look, "for starters at least," to contemporaneous legal dictionaries to

determine what specialized meaning the legislature may have intended. *Id*. (internal quotation marks omitted).

The Court of Appeals looked to a dictionary of common usage to determine the "ordinary meaning" that the legislature presumably intended for all of the disputed terms. *See Brown*, 323 Or App at 223 (quoting *Webster's Third New Int'l Dictionary* (unabridged ed 2002)). But, as our discussion in *Marshall* cautions, some terms of common usage also are used as terms of art in the context of a specialized field, such as the legal field. *Id*. at 542. And when a statute uses such terms, consulting both ordinary usage and contemporaneous legal dictionaries can supply a helpful starting point to understand how the legislature intended to use the term. *See id*. at 542-43 (considering definitions in both ordinary and legal dictionaries to determine the legislature's intended meaning for terms "injury" and "property").

a.   "Sells" and "seller"

The term "sell"—the root of both "sells" and "seller"—is a term of common usage that sometimes is used as a term of art in the legal field, but both common-usage dictionaries and legal dictionaries identify a similar range of meanings, including simply an act of transferring property to another for consideration. At the time that the legislature enacted ORS 30.920, common usages of the term "sell," included "to give up (property) to another for money or other valuable consideration," to "hand over or transfer title (as goods or real estate) for a price," "to offer for sale," and "to give up in return for something else." *Webster's Third New Int'l Dictionary* 2061 (unabridged ed 1976);[3] *Webster's Collegiate Dictionary* 786 (7th ed 1970). And as a legal term of art, "sell" was defined as simply "[t]o dispose of by sale." *See Black's Law Dictionary* 1220 (5th ed 1979) (defining "sell").

Definitions of the term "sale," in turn, referred to a broad range of transactions. As a term of common usage,

_____

[3] An advantage in consulting definitions set out in *Webster's Third New Int'l Dictionary* to understand how the legislature would have understood the words that it uses in statutes—and one reason that this court consults that dictionary so frequently—is that, unlike other dictionaries, which set out to prescribe the "'correct' usage" for words, *Webster's* "is a dictionary with a 'descriptive' focus, reporting ordinary usage." *Kohring v. Ballard*, 355 Or 297, 304 n 2, 325 P3d 717 (2014).

"sale," referred (somewhat circularly) to "the act of selling" and also more particularly to "a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price." *Webster's* at 2003 (unabridged ed 1976); *see also Webster's Collegiate* at 759 (defining "sale" as "the act of selling" and also "the transfer of ownership of and title to property from one person to another for a price"). The definitions of "sale" as a legal term of art were extensive, but included both broad references to the "[t]ransfer of property for consideration either in money or its equivalent" and "[a]n agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself." *Black's* at 1200. Those definitions, collectively, suggest that the legislature enacted ORS 30.920 with the intent that one who "sells" or is a "seller" of a product could include anyone who transfers the product to another in exchange for money or other valuable consideration.[4]

Providence, nevertheless, urges this court to presume that the legislature intended "sell" for purposes of ORS 30.920 to incorporate the legal definition of "ownership"—as meaning the "[c]ollection of rights to use and enjoy property, including the right to transmit it to others," *Black's* at 997—or the definition of "sale" that appears in Oregon's Uniform Commercial Code, which specifies that, "[i]n this chapter, unless the context otherwise requires *** [a] 'sale' consists in the passing of title from the seller to the buyer for a price." ORS 72.1060(1). From those definitions, Providence concludes that it did not "sell" the Zofran that it supplied and administered to Gomez, because a patient in that context does not acquire the right to "use the medication as she wishes, nor can she transfer it to someone else." According

---

[4] Our statement that the term "sells" *includes* an exchange for valuable consideration accommodates some contextual indications that the legislature may have intended that liability under ORS 30.920 would not be contingent on a consumer purchasing the product. *See Restatement (Second) of Torts* § 402A comment l (1965) (explaining that, for the rule of strict product liability to apply, "[i]t is not even necessary that the consumer have purchased the product at all"; instead, "[h]e may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser"); ORS 30.920(3) (specifying legislative intent that liability under the statute "shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)").

to Providence, a "'sale' involves the transfer of title and ownership in a product, and that means that the transferee receives the full panoply of rights attendant to ownership." But we are not persuaded. Although Providence's incorporation of the rights of "ownership" is understandable given the Court of Appeals' reliance on "ownership" to define "sell," *see* 323 Or App at 223, the reliance is misplaced.

As an initial matter, the words "ownership" or "title" do not appear in the text of ORS 30.920. The Court of Appeals included the term "ownership" in its definition of "sells" through an exercise of linking definitions: *Webster's* defines "sell," in part, as referring to offering an item "for sale"; and one of its definitions of "sale" refers to transferring "ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)"; therefore "one 'sells' a product when one transfers ownership of the product to another in exchange for valuable consideration." 323 Or at 223 (quoting *Webster's* at 2003, 2061-62 (unabridged ed 2002)). And Providence takes the exercise a step farther by linking to a legal definition of "ownership" and what it assumes to be a restrictive concept of "title."

But the fact that transferring "ownership" or "title" is included in some definitions of "sale"—which, in turn, appears in some definitions of "sell"—does not mean that the legislature intended the term "sells" to convey that strict liability under ORS 30.920 is limited to transactions in which a consumer acquires the defective product in a form that accommodates transfer to a new owner. As a matter of logic, the fact that a transfer of the "full panoply" of the rights of ownership is a "sale," does not mean that every "sale" transfers what Providence views as the "full panoply" of the rights of ownership, let alone that "sells" is limited in that way. And, as a matter of statutory construction, we reiterate our oft-repeated caution that dictionary definitions are only a useful starting point for understanding what the legislature may have intended the terms of a statute to mean. *Marshall*, 371 Or at 543. Some of the definitions of "sale" that we quoted above make no reference to transferring "title" or ownership rights. But even when dictionary

definitions supply clear definitions of the terms used in a statute, we do not rely "solely on dictionary definitions to determine the meaning of statutory terms 'without critically examining how the definition fits into the context of the statute itself.'" *Id.* (quoting *State v. Gonzalez-Valenzuela*, 358 Or 451, 461, 365 P3d 116 (2015)).

Here, the context of the statute as a whole persuades us that strict liability for one who "sells" a defective product is not limited to those who transfer the "full panoply" of ownership rights to the product, or "title" to the product in the formal sense contemplated by Providence. As the text of ORS 30.920(1) makes clear, the legislature created strict liability that applies equally to one who "sells *or leases*" a defective product if the "seller or lessor is engaged in the business of selling or leasing such a product." (Emphasis added.) The legislature's decision to create identical liability for transactions consisting of a lease, which transfers fewer than all rights of ownership, suggests that the legislature was not concerned about limiting liability to those who transfer all rights of ownership in a product, which makes it more likely that it did not intend liability for one who "sells" a defective product to be limited in that way. *See, e.g.*, *State v. Hubbell*, 371 Or 340, 351, 537 P3d 503 (2023) (describing and applying the "oft-invoked principle of statutory construction" under which, "when a word appearing in a list or grouping is capable of more than one meaning, the meaning that is more consistent with the other words in the group may better reflect legislative intent"); *Black's* at 800 (defining "lease" with respect to "tangible personal property" as meaning "a contract by which one owning such property grants to another the right to possess, use and enjoy it for specified period of time").

Equally significant, ORS 30.920(3) specifies that the liability provisions of the statute are to "be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)." That section of the Restatement addresses strict products liability, and the comments explaining the scope of that liability are context for what the legislature intended ORS 30.920 to cover. *Griffith v. Blatt*, 334 Or 456, 467-68, 51 P3d 1256 (2002). Neither the terms

"ownership" or "title," nor the concept "rights of ownership," appears in the comments to section 402A. Moreover, comment l illustrates that liability can be based on transactions in which a product is entirely consumed by being administered to the consumer. The comment explains that a "customer in a beauty shop to whose hair a permanent wave solution is applied by the shop" may recover in strict liability. *Id.* As with a drug that is administered intravenously, the application of a permanent wave solution leaves the consumer no ability to transfer the solution to anyone else, because the product is consumed—which is its intended purpose.[5] Accordingly, we are unpersuaded by Providence's argument that we should construe ORS 30.920 as if the legislature had intended to exclude from the meaning of "sells" the transfer of defective products that the consumer fully consumes.

b.    "Engaged in the business of selling"

Next, we consider the parties' dispute regarding what the legislature intended by the requirement that strict liability for a defective product applies to a "seller" that is "engaged in the business of selling such products." According to Providence, the phrase "engaged in the business of selling" does not include hospitals that supply pharmaceutical drugs to consumers in conjunction with health care services. Providence proposes two reasons for that exclusion: First, it contends that the phrase limits strict liability to businesses for which the "essence of the transaction" with the public is selling a product,[6] and, second, it contends that the legislature did not intend strict liability to extend to hospitals that

---

[5] The concept of transferring the rights of ownership may look different in the context of a product that is consumed in the process of transfer. For example, Providence argues that it did not transfer ownership of the Zofran to Gomez, but it also did not retain ownership of the Zofran, which leaves the question, "Where did ownership of the Zofran go?" Similarly, the concept of transferring "title" that is used for Oregon's Commercial Code is flexible enough to explain what happens when a cafe serves a glass of wine or plate of scrambled eggs to a customer. *See* ORS 72.3140 (under UCC, "sale" includes serving food or drink to be consumed on the premises); *Gardyjan v. Tatone*, 270 Or 678, 680, 528 P2d 1332 (1974) (observing that plaintiff, seeking recovery from restaurant that sold an omelet tainted with staphylococcal germs, "could have alleged a breach of the implied warranty of merchantability" under the commercial code "or strict liability in tort").

[6] Providence maintains that the "essence" of its transaction with Gomez was not the "selling" of Zofran. Although the supplying of Zofran to treat Gomez's nausea arguably was part of the essence of the transaction, we accept Providence's characterization for purposes of this opinion.

sell a medication to consumers in the course of providing medical services.

Neither the common meaning of "engaged in the business of selling" nor that phrase in the context of the statute supports Providence's limiting construction. Looking first to the contemporaneous meaning of the terms, "seller" was defined similarly in both ordinary-usage and legal dictionaries as simply meaning one that "offers for sale," *Webster's* at 2062 (unabridged ed 1976), or "sells anything," *Black's* at 1220. Common usages of "engage" were "to begin and carry on an enterprise, esp[ecially] a business or profession," "to employ or involve oneself," or "to take part : PARTICIPATE." *Webster's* at 751 (unabridged ed 1976). "Business," as used in this context, commonly means "a usu[ally] commercial or mercantile activity customarily engaged in as a means of livelihood and typically involving some independence of judgment and power of decision." *Id.* at 302. And "selling" was used to refer to "the act, process, or art of offering goods for sale." *Id.* at 2062; *see Black's* at 1200, 1220 (defining "sell"—the root of "selling"—as "[t]o dispose of by sale" and the term "sale" as meaning "[t]ransfer of property for consideration"). Accordingly, we understand the ordinary usage of the phrase "engaged in the business of selling" products to include those whose business activity regularly involves transferring products to others in exchange for consideration.

The context of the statute as a whole further suggests that the legislature intended the phrase "engaged in the business of selling" to have a meaning consistent with the ordinary usages of the terms. As described above, the comments to section 402A of the Restatement provide important context that informs our understanding of what the legislature intended by "engaged in the business of selling." 372 Or at 235. As we will explain, those comments point to a construction of "engaged in the business of selling" that is not compatible with Providence's contention that the phrase excludes businesses for which the "essence of the transaction" between the business and consumer is providing a service.

As an initial reference point, the beauty-salon example in comment l suggests that the legislature did not intend to limit the scope of strict liability to transactions in which the "essence of the transaction" with the consumer is the sale of a product. Although comment l is focused on who qualifies as a "user or consumer" of a product, it makes clear that liability can arise even when the only transaction in which the consumer participates is primarily the purchase of a service.

The scope of the rule comes through even more clearly in comment f, which clarifies what engaged in the "business of selling" a product means:

> "It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home."

*Restatement* § 402A comment f. As that example illustrates, however, a business can be engaged in the business of selling a type of product even when selling such products is ancillary to the service (entertainment) that represents "the essence" of the business's interaction with consumers. In fact, the comment suggests that the primary limitation on what qualifies as "engaged in the business of selling" is that it excludes "the ordinary individual who makes the isolated sale." *Id.* As comment f explains:

> "The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it."

*Id.* Relatedly, comment f specifies that, even for merchants otherwise engaged in the business of selling products, the rule of liability does not apply to sales made "out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like." *Id.*

Thus, construing ORS 30.920 in accordance with the comments to section 402A—as the legislature has directed—we conclude that the distinction between one who is "engaged in the business of selling" a product and one who is not depends on whether the seller sells the product as part of the usual course of its business, even if selling the product is ancillary to providing services to the consumer. That construction is bolstered by the purpose of imposing strict liability on one "engaged in the business of selling":

> "The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods."

*Id*.

Finally, relevant context for interpreting the text of ORS 30.920 comes from this court's prior decisions addressing strict products liability under the common law, of which we presume the legislature was aware when it enacted ORS 39.920. *See, e.g.*, *Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 341, 353 P3d 563 (2015) ("The context for interpreting a statute's text includes the preexisting common law, and we presume that the legislature was aware of that existing law."). Although strict products liability in Oregon is now governed exclusively by the statutory framework in ORS 30.920, *Griffith*, 334 Or at 466, this court had previously adopted and applied section 402A as Oregon's common-law standard for strict products liability claims, *Heaton v. Ford Motor Co.*, 248 Or 467, 470, 435 P2d 806 (1967). But concerns that the rules of liability might continue to evolve if left entirely to the courts, at least in part, motivated the legislature to "stabilize the rules of [product] liability" by codifying section 402A, albeit with a few modifications that expanded liability beyond what 402A described. *Ewen v. McLean Trucking Co.*, 300 Or 24, 28, 706 P2d 929 (1985); *see also Allen v. The Heil Company*, 285 Or 109, 119 n 5, 589 P2d 1120 (1979) ("It should be remembered that [section] 402A is not a statute and that as an attempted restatement of common law it is binding upon

this court only so long and in such particulars as we may find appropriate.").

One of the decisions of which the 1979 legislature presumably was aware when codifying the strict liability described in section 402A is *Hoover v. Montgomery Ward & Co.*, 270 Or 498, 528 P2d 76 (1974). Significantly, in the course of examining whether the defendant could be strictly liable under section 402A for negligently installing a tire that was *not defective*, this court in *Hoover* described a "series" of "sale-service hybrid" cases from other jurisdictions, which held that a party that provides a dangerously *defective* product in the course of providing a service may be subject to strict liability—when it was "clear that the product, as opposed to the service, was defective." *Id.* at 501-02 (citing *Friend v. Childs Dining Hall Co.*, 231 Mass. 65, 120 NE 407 (1918) (restaurant could be liable for supplying tainted food); *State Stove Manufacturing Company v. Hodges*, 189 So 2d 113 (Miss 1966), *cert den*, 386 US 912 (1967) (contractor could be liable for supplying defective hot water heater); *Worrell v. Barnes*, 87 Nev 204, 484 P2d 573 (1971) (carpenter could be liable for supplying defective gas pipe fittings); and *Carpenter v. Best's Apparel, Inc.*, 4 Wash App 439, 481 P2d 924 (1971) (beauty shop could be liable for supplying defective permanent wave solution)).

Although *Hoover* ultimately rejected that approach as "inapposite to the case at hand," because the plaintiff alleged only that the *service* was defective, *id.*, at 501-02, we presume that the legislature was aware of our discussion of the cases imposing strict liability on those who sell defective products as part of "sales-service hybrid" transactions. That context suggests that, if the legislature had intended to preclude liability for businesses engaged in selling products in conjunction with providing a service, it would have understood the need to make that limitation explicit. For all of the reasons described above, we are persuaded that the text and context of ORS 30.920 point to a legislative intent that strict liability for those "engaged in the business of selling" a product reaches those who supply the product in conjunction with providing a service, regardless of the "essence of the transaction."

Providence nevertheless argues that the legislature did not intend that a hospital would be considered a seller "engaged in the business of selling" for purposes of ORS 30.920. Although nothing in the text of the statute suggests an intent to exclude hospitals from the scope of liability under ORS 30.920, Providence points to what it contends are other contextual indications to support that legislative intent.

First, Providence contends that applying ORS 30.920 to a hospital that supplies a drug in the course of providing healthcare services would not fit the justification for strict liability that is described in comment c. The comment explains, in part, that

> "the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it[.]"

According to Providence, "marketing" a product involves making "goods available to buyers in a planned way that encourages people to buy more of them," and it did nothing to encourage patients to seek Zofran. And Providence faults the Court of Appeals for describing "market" as simply a synonym for "sell." *See Brown*, 323 Or App at 226. Even accepting Providence's premise that "market" in comment c has a meaning distinct from "sell," however, Providence's reliance on comment c is misplaced. In our view, the portion of comment c that Providence emphasizes simply illustrates that a business that markets its products should be held strictly liable—not that proof of marketing should be required for liability. In fact, the rest of the comment explains another justification for strict liability that is fully applicable to a hospital in Providence's circumstances: "[T]he public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods." *Restatement* § 402A comment c. Pursuant to ORS 30.920(3), we are directed to construe the liability provisions of ORS 30.920 consistently with *all* the comments from a to m, and— as explained above—the comments as a whole persuade us

that a hospital supplying drugs that it also administers can be subject to strict liability.

Second, Providence insists that relevant context can be found in the definitions of "hospital" that are set out in a different, current statute and in a 1979 administrative rule, both of which treat a hospital as a service provider, and not a seller of products. *See* ORS 442.015(15); OAR 333-23-114(a) (1979). We are not persuaded.

ORS 442.015(15) defines a "hospital," for purposes of chapters governing Public Health and Safety, as:

"(a) A facility with an organized medical staff and a permanent building that is capable of providing 24-hour inpatient care to two or more individuals who have an illness or injury and that provides at least the following health services:

"(A)   Medical;

"(B)   Nursing;

"(C)   Laboratory;

"(D)   Pharmacy; and

"(E)   Dietary; or

"(b)   A special inpatient care facility \* \* \*."

But ORS 442.015(15) provides no relevant context for whether the 1979 legislature intended to exempt hospitals from strict product liability. Beyond the fact the statute does not purport to prohibit hospitals from selling products, the definition of "hospital" was not adopted until 2001, and the statute defines terms for an area of law that is unrelated to tort liability for a defective product. Or Laws 2001, ch 104, § 181; *see Ogle v. Nooth*, 355 Or 570, 585, 330 P3d 572 (2014) (explaining that "[a] statute's context includes other provisions of the same or related statutes").

Although the administrative rule to which Providence cites may have been in effect when the legislature enacted ORS 30.920, it also supplies no relevant context for the scope of the statute. OAR 333-23-114(a) (1979) was a rule promulgated by the Health Division of the former Oregon Department of Human Resources. Providence argues that

the rule defined a "hospital"—for purposes of the Health Division's regulatory framework—"entirely with regard to the professionals who work there and the variety of health-care services they provide," with no hint that the department "regarded them as sellers of anything."[7] Even accepting that characterization, however, the existence of an administrative rule from that distinct regulatory context provides no reason to conclude that the legislature intended to exclude hospitals from the liability established by ORS 30.920. Nothing in the rule suggested that hospitals were precluded from selling medical products to their patients. Moreover, Providence offers no reason that an administrative rule identifying the entities that were regulated by the health authority in 1979 would supply relevant context for what the legislature intended when it enacted a statute addressing tort liability for the seller of a defective product.

Third, Providence cites decisions from courts in other states that have applied some variation on Providence's "essence of the transaction" rule to conclude that hospitals are not strictly liable for harm caused by the defective products that they supply. For the most part, those cases were decided after the enactment of ORS 30.920 and, therefore, cannot inform our understanding of what the legislature intended. Moreover, they rely on common-law principles from other states and policy considerations that are not part of this court's framework for construing an Oregon statute. *See, e.g.*, *Hector v. Cedars-Sinai Medical Center*, 180 Cal App 3d 493, 502, 508, 225 Cal Rptr 595, 598, 602 (1986) (deciding case based on California common law and policy considerations); *Easterly v. HSP of Texas, Inc.*, 772 SW 2d 211, 213 (Tex Civ App 1989) (deciding case based on Texas common law); *Cafazzo v. Cent. Medical Health Services*, 542 Pa 526, 532, 534-36, 668 A2d 521, 525-26 (1995) (deciding case based on other jurisdictions' cases and policy considerations); *Royer v. Catholic Medical Center*, 144 NH 330, 332-35, 741 A2d 74, 76-78 (1999) (deciding case based on New

___

[7] OAR 333-23-114(a) (1979) defined a hospital, in relevant part, as "an establishment with an organized medical staff, with permanent facilities that include inpatient beds, and with medical services, including physician services and continuous nursing services under the supervision of registered nurses, to provide diagnosis with medical or surgical treatment."

Hampshire common law and policy considerations). As we have explained, "this court's consideration" of limitations to the liability created under ORS 30.920 "begins and ends with our construction of the pertinent product liability statutes." *Griffith*, 334 Or at 466.

Because two cases were decided before 1979, they could be relevant to what the 1979 legislature intended. As we will explain, however, the bare existence of those cases does not persuade us that the legislature intended to include a similar limitation on liability for hospitals in Oregon. The first case is *Perlmutter v. Beth David Hospital*, 308 NY 100, 107, 123 NE 2d 792, 796 (1954), in which the New York court decided that a hospital was not liable under the state's Sales Act for breaching implied warranties when it transfused "bad blood" into a patient. The court explained that the Sales Act, New York's precursor to the Uniform Commercial Code, had long been recognized as excluding transactions in which the transfer of personal property was "an incidental feature of the transaction," *id.* at 104, and the court highlighted policy concerns about imposing liability under the Act "upon the institution or agency actually seeking to save or otherwise assist the patient." *Id.* at 107.

Providence offers no reason to conclude that the 1979 legislature was aware of *Perlmutter*. Nor is there any reason to presume that the legislature would have been influenced by a decision involving principles of New York sales law when codifying a strict product liability rule that is based on principles of tort law. *See Heaton*, 248 Or at 470 (explaining that the liability that the court had recognized for dangerously defective products "was specifically rationalized as strict liability in tort"); *see also Restatement* § 402A comment l ("The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.").

The other case decided prior to 1979 is a decision by the California Court of Appeal. In that case, the court declined to extend the state's common-law doctrine of strict products liability to a hospital for harm that a patient suffered when a defective surgical needle broke and became embedded in the patient while the surgeon was suturing a

wound. *Silverhart v. Mount Zion Hospital*, 20 Cal App 3d 1022, 1025, 1027, 98 Cal Rptr 187, 189, 190-91 (1971). The court reasoned, in substantial part, that the hospital could not be a "seller," because "the hospital itself was a *user* of the needle since such needle was supplied to the hospital for its use in performing medical services incident to the normal and ordinary business of the hospital." *Id.* at 1028 (emphasis added). In other words, the California scenario did not involve a hospital engaging in a transaction that involved supplying a product to a patient. Thus, even assuming that the Oregon legislature was aware of decisions from the California Court of Appeal, we are not persuaded that the *Silverhart* opinion would have influenced the legislature to exclude hospitals from the reach of ORS 30.920 when they engage in commercial transactions involving a sales-service hybrid. In short, the text and relevant context of ORS 30.920 indicate that the legislature intended the liability for one "engaged in the business of selling" a product to include those who supply products to their customers in conjunction with providing a service, and without any exception for a hospital that engages in such hybrid transactions.

## 2.   *Legislative history*

The parties have not offered any useful legislative history to assist in our construction of ORS 30.920, and, as we will describe, we have found none. The liability provisions set out at ORS 30.920 have remained essentially unchanged since their adoption in 1979.[8] Or Laws 1979, ch 866, § 2. The 1979 legislation added the strict liability provisions now set out at ORS 30.920 as well as a provision governing the recovery of punitive damages in a product liability civil action and provisions governing insurers providing "product liability insurance." Or Laws 1979, ch 866, § 2. As explained above, the 1979 legislature was motivated, at least in part, to "'stabilize the rules of [product] liability,'" which until then was developing in Oregon entirely through court decisions. 372 Or at 239 (quoting *Ewen*, 300 Or at 28). In developing the new statute, the legislature heard from business

---

[8]   Oregon Laws 1979 chapter 866, section 2 originally used the phrase "to his property" instead of "to the property of the user." *Compare* Or Laws 1979, ch 866, § 2 *with* ORS 30.920(1).

groups concerned about rising costs for liability insurance that "they attributed to the unpredictability of potential exposure in what was then a rapidly evolving branch of the law." *Ewen*, 300 Or at 28. They also heard competing concerns from other witnesses and legislators "that legislation not reduce the financial protection under existing Oregon law for persons injured by dangerous products." *Id*. But we have found no record indicating that the 1979 legislature heard concerns about applying strict liability to hospitals or other service providers whose transactions with consumers involve supplying products in conjunction with providing a service.

Plaintiffs contend that some indication of legislative intent can be found in later-enacted statutes, which create exceptions to the strict liability set out in ORS 30.920 for limited circumstances in which a product is supplied in the context of medical services, echoing reasoning of the Court of Appeals. 323 Or App at 228-30 (describing ORS 30.902, 30.908(5), and *former* 97.300 (1991), *renumbered as* ORS 97.968 (1995) and *renumbered as* ORS 97.985 (2007)). Although recognizing that the later-enacted statutes were "not indicative of the legislature's intent" when it enacted ORS 30.920, the Court of Appeals nevertheless reasoned that the exceptions—none of which exempt a hospital supplying a drug in conjunction with medical services—would have been unnecessary if ORS 30.920 already "exclude[d] those who sell products in the provision of services." *Id*. at 228. We acknowledge that this court has occasionally consulted later legislative history in determining the meaning of a statute. *State v. Cloutier*, 351 Or 68, 103-04, 261 P3d 1234 (2011). But, as we ultimately reasoned in *Cloutier*, the subsequent "legislative history, at best, arguably confirms what we have determined to be the intended meaning" of ORS 30.920, so "we need not address the weight, if any, to which the [later] legislative history is entitled in this case." *Id*. at 104.

In short, the legislative history adds nothing to the conclusions that we reached, based on our analysis of text and context, about the intended scope of strict liability under ORS 30.920. First, the legislature intended that liability

for one who "sells" a dangerously defective product would include transactions in which the product is transferred for consideration even if the product is fully consumed as part of the transaction. Second, the legislature intended that a "seller" includes one who engages in such a transaction and that a "seller" could be "engaged in the business of selling" a product when the transfer of such products for consideration is part of the seller's usual course of business, regardless of whether the seller transfers such products only in conjunction with providing a commercial service. And third, the legislature did not intend to exempt hospitals that otherwise meet the definition of a "seller or lessor engaged in the business of selling or leasing such a product."

B. *Application to this Case*

As described at the outset, this case reaches us from a grant of summary judgment to Providence. A party is entitled to summary judgment "if the pleadings, depositions, affidavits, declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C. We explained above that Providence moved for summary judgment on the basis of its legal argument that, "[a]s a provider of health services, [Providence] is neither a seller in the business of selling Zofran injectable nor is it a distributor of Zofran," for purposes of liability under ORS 30.920, and only supplies drugs to be administered to patients in the hospital. Our conclusion that the legislature did not intend ORS 30.920 to be construed in the limited manner that Providence proposes demonstrates why the trial court erred in granting the motion for summary judgment.

But Providence's arguments on appeal add a new challenge to the premise underlying plaintiffs' allegation that Providence "sold" the Zofran that Gomez received at the emergency room. It notes that although the Court of Appeals asserted that Providence had specifically charged Gomez for Zofran, 323 Or App at 232, the record does not support that assertion. However, to the extent that Providence asserts that the record does not demonstrate that it sold Zofran to Gomez—because Gomez's hospital bill did not include a

specific charge for that drug—we do not reach that argument because Providence failed to raise that issue in its motion for summary judgment.

As we emphasized in *Two Two*, "[p]arties seeking summary judgment must raise by motion the issues on which they contend they are entitled to prevail as a matter of law," and a party opposing summary judgment has no burden to produce evidence on an issue that the moving party has not raised. 355 Or at 326. In other words, had Providence raised in its motion for summary judgment the factual issue whether it had charged Gomez for Zofran, plaintiffs—who bear the burden of persuasion on that issue at trial—would have been required under ORCP 47 C to produce evidence on the issue to defeat summary judgment. *See id*. at 325 (explaining significance of a defendant raising an issue in its motion for summary judgment). But Providence's failure to raise that factual issue means that plaintiffs had no burden to produce evidence regarding their allegation that Providence "sold" the Zofran that it supplied to Gomez, and it means that "we accept as true" the uncontested allegations in the complaint for purposes of the summary judgment motion. *See Bagley v. Mt. Bachelor, Inc.*, 356 Or 543, 545-46, 340 P3d 27 (2014) (so holding with respect to issues of negligence, causation, and damages that the defendant did not raise in its motion for summary judgment).

Providence sought summary judgment on the basis that, as a matter of statutory construction, a hospital that supplies and administers a drug to a patient is not a "seller" of the drug or "engaged in the business of selling" such drug, as required for liability under ORS 30.920. And we have explained why we disagree with Providence's construction of the statute. Thus, Providence has not established that it was entitled to prevail as a matter of law on plaintiffs' claim under ORS 30.920.

The decision of the Court of Appeals is affirmed. The judgment of the trial court is reversed, and the case is remanded to the trial court for further proceedings.